565 P.2d 893

Jack L. KEPLINGER and Janice E. Keplinger, husband and wife, Appellants,

v.

MID–CENTURY INSURANCE COMPANY, Preferred Risk Insurance Companies, and Roger S. Roof, Appellees.

No. 2 CA–CIV 2205.

Court of Appeals of Arizona, Division 2.

March 14, 1977.

Rehearing Denied April 15, 1977.

Review Denied May 24, 1977.

Leslie J. Gilbertson, Tucson, for appellants.

Everett, Bury & Moeller, P.C. by David C. Bury and Dan A. Sinema, Tucson, for appellee Mid-Century.

Pain & Julian, P.C. by Theodore A. Julian and Warren S. McCord, Phoenix, for appellee Preferred Risk.

HOWARD, Chief Judge.

This appeal is from a declaratory judgment decreeing that policies of insurance issued by the appellees-insurers (hereinafter referred to as Mid-Century and Preferred Risk) did not provide liability insurance coverage to appellee Roof for an automobile accident in which appellant-wife was injured. The court expressly found that the automobile driven by Roof was a "non-owned" automobile and that during the period of time in issue, it was being regularly and frequently used and driven by him in the course of his employment by appellants in delivering newspapers, and that Mid-Century's insurance policy issued to Roof provided no coverage since it excluded coverage for Roof while operating a vehicle not owned by him but which had been furnished for his regular or frequent use. The court also found that the insurance policy issued by Preferred Risk to Mr. Keplinger provided no coverage since the insured vehicle was used in the transportation of goods within the meaning of an exclusionary provision in the policy and further, that representations made by Mr. Keplinger were false and fraudulent, material and relied upon by Preferred Risk, thereby vitiating the coverage on the policy.

The facts are as follows. Roof was employed by appellants to help Mrs. Keplinger deliver newspapers to Ajo. Appellants owned a 1971 Datsun pickup truck and a station wagon. On the morning of January 13, 1973, Roof was driving the truck towards Ajo with Mrs. Keplinger riding as passenger. Roof apparently fell asleep and the pickup truck rolled over, throwing Mrs. Keplinger from the vehicle and causing her serious bodily injury. Mrs. Keplinger began delivering newspapers to Ajo about 4 months prior to the accident and had hired Roof to help her shortly after undertaking the Ajo route. Roof accompanied Mrs. Keplinger every day of the week with the exception of his one day off, and from the middle of November until January 13, 1973, the date of the accident, the Datsun pickup was used to deliver newspapers to Ajo.

## MID–CENTURY POLICY

The insurance policy issued to Roof by Mid-Century provided that Mid-Century would pay all damages the insured became legally obligated to pay because of bodily injury to any person and/or damage to property arising out of the use of a non-owned automobile. The policy defined a non-owned automobile:

"Non-owned automobile means an automobile not owned by *or regularly or frequently used by the named insured* or any resident of the same household, other than a substitute vehicle." (Emphasis added)

Thus we see that if Roof's use of the pickup truck was regular or frequent, there was no coverage for the accident under the Mid-Century policy. The purpose of a "drive other cars" provision is to cover the occasional or incidental use of other cars without the payment of an additional premium, but concomitantly, to exclude habitual use of other cars which would increase the insurer's risk without a corresponding increase in premium. In other words, the insurance policy is not intended to cover the insured with respect to the use of another automobile which he frequently uses or has the opportunity to use frequently, 13 Couch on Insurance 2d, 45:1052.

Appellants rely on *Travelers Indemnity Company v. Hudson*, 15 Ariz.App. 371, 488 P.2d 1008 (1971), and *Coombs v. Lumbermen's Mutual Casualty Company*, 23 Ariz.App. 207, 531 P.2d 1145 (1975), for the

proposition that "regular use" denotes continuous, uninterrupted possession of the vehicle with the privilege and opportunity of its use at such times and for such purposes as Roof wished. We need not, however, discuss the applicability of the "regular use" exception as to which, a reading of the cases discloses, no hard and fast rule has been established and each case depends upon the particular facts. See Annot. 86 A.L.R.2d 937, § 6.

The Mid-Century exclusion applies either to regular use or to frequent use. The term "frequent use" has been held to mean an often-repeated but irregular, casual, or incidental use as distinguished from a regular use. *Continental Casualty Company v. Suttenfield*, 236 F.2d 433 (5th Cir. 1956). Roof drove the Datsun pickup at least six times a week for the two months preceding the accident, and therefore it cannot be denied that his use of the truck, albeit for a special purpose, was repeated often. We believe the evidence supported the conclusion of the trier of fact that Roof's use of the Datsun pickup was not a mere occasional use so as to come within the coverage of the Mid-Century policy. Since resolution of this question is for the trier of fact, *Brooks v. Link*, 212 Kan. 690, 512 P.2d 374 (1973), we defer to the trial court's determination.

## PREFERRED RISK POLICY

The next question is whether the trial court erroneously concluded that the Preferred Risk automobile policy did not provide coverage for the accident. As noted above, the court found that the Datsun pickup truck was used in the transportation of goods within the meaning of a policy provision excluding coverage "while the automobile is used as a public or livery conveyance unless such use is specifically declared and described in the policy." The court also found that representations made by Mr. Keplinger were false and fraudulent, material and relied upon by Preferred Risk, thereby vitiating the coverage of the policy.

We do not agree with the trial court that the policy exclusion as to use as a public or livery conveyance applied to the Keplingers' use of the pickup for delivering newspapers. True the term "public livery or conveyance" encompasses freight as well as persons. *Sonoco Products Company v. Travelers Indemnity Company*, 315 F.2d 126 (10th Cir. 1963). However, there must be an indiscriminate holding out of the vehicle for public use. *Smith v. Stonewall Casualty Company*, 212 Va. 765, 188 S.E.2d 82 (1972); *American Fidelity Fire Insurance Co. v. Pardo*, 32 A.D.2d 536, 299 N.Y.S.2d 521 (1969); *Lakeshore Development Corp. v. Gulf Insurance Company*, 353 F.2d 163 (5th Cir. 1965); *Canal Insurance Company v. Gensco, Inc.*, 404 S.W.2d 908 (Tex.Civ. App.1966); 13 Couch on Insurance 2d 45:1040; see Annot. 30 A.L.R.2d 273. The facts presented here do not show that the pickup truck was available to the public generally and therefore the exclusion did not prevent coverage.

We also disagree with the trial court's conclusion that the policy coverage was vitiated by misrepresentations of Mr. Keplinger in the insurance application.

The application indicated that the Datsun pickup would be used for pleasure and driven to work five miles each way, that the number of trips per week would be five, and that no passengers would be carried. Mrs. Keplinger was named as another driver in the household and the application, which Mr. Keplinger admitted having read, recited:

"I declare the facts stated on both sides of this application are true, and request the company to issue the insurance and any renewals thereof in reliance thereon."

In the section of the policy denominated CONDITIONS, we find the following:

"26. Declarations:
By acceptance of this policy the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all

agreements existing between himself and the company or any of its agents relating to this insurance."

■ The application and the insurance policy taken together constitute the contract of insurance. 13A, Appleman Insurance Law and Practice, § 7582. In order for an insurer to avoid liability on the policy, it must show that a misrepresentation, omission, concealment of facts or incorrect statement in the application was fraudulent, material either to the acceptance of the risk or to the hazard assumed by the insurer, and that it would not in good faith have issued the policy or would not have issued it in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss. *Central National Life Insurance Company v. Peterson*, 23 Ariz.App. 4, 529 P.2d 1213 (1975); A.R.S. § 20–1109.

■ The application for insurance on the Datsun pickup was written on January 20, 1971, and provided for a six-month policy period. Although it is true that the facts stated therein concerning the use of the vehicle were then correct, the application itself provided that the insurer was to rely on the facts stated therein in issuing renewals of the insurance. There is authority for the proposition that in the absence of a new application, a renewal is impliedly made on the basis that the statements in the original application are still accurate. See 17 Couch on Insurance 2d, 68:37. Preferred Risk's application, however, *specifically* provided that the statements made in the application were intended to represent a continuing future use of the pickup and therefore Preferred Risk had a right to rely upon the truth of such statements as a basis for issuing the subsequent renewals. See *Harrington v. Aetna Casualty and Surety Company*, 489 S.W.2d 171 (Tex.Civ.App. 1972).

At the beginning of November in 1972, the appellants commenced use of the Datsun pickup for hauling newspapers to Ajo. This use of the vehicle meant that it was being driven 400 miles per day or 2,400 miles per week. The insurance application indicated that the pickup would be used for pleasure and additionally, would be driven fifty miles per week to work. It is thus apparent that the actual use of the pickup for two months before the accident was considerably different than the use represented in the application.

Preferred Risk had the burden of proof as to grounds for avoiding liability on its policy. 19 Couch on Insurance 2d §§ 79:398 and 79:417. Its position was that it would not have provided coverage for the pickup had it known that it was being used to transport newspapers great distances and that the Keplingers' concealment of this use of the truck was material and relied upon by Preferred Risk in renewing the policy.

We do not believe Preferred Risk satisfied its burden of proof. Mr. Reed, the company's Arizona sales manager testified that Preferred Risk did not have a policy to cover the delivery of papers. He stated:

"No, this is a commercial operation and ours is pursuant to personal lines, automobile coverage, we just don't engage in that."

This testimony, however, is refuted by the fact that after the accident in question, Preferred Risk continued to provide coverage for the truck at an increased premium and the amended declaration indicated that the purpose for which the vehicle would be used was "commercial." Mr. Keplinger testified that in March, 1972, after the accident, he was in the Preferred Risk office to sign some papers concerning the accident. He conversed with a man who, according to him, was an adjuster for Preferred Risk. The man told him that the insurance policy Keplinger had did not cover the vehicle if it was being "used over so many miles" and referred him to an agent sitting behind him in the same office "to have him change the policy." He further testified:

"Q. What was your conversation with this agent?

A. I told him how many miles we were driving and he wrote down something else and I had to give him more money.

Q. Is it true you told both of the people that you were making the Ajo run and you explained that to him?

A. Yes.

Q. The additional miles that you were referring to was with the miles back and forth to Ajo?

A. Yes, it was coming to about 2,400 miles a week.

Q. What did they indicate that they were going to do as a result of you making that extra mileage?

A. They was going to change it to a commercial type insurance.

Q. And what was the practical result going to be to you; did they say?

A. They didn't say, that I can remember, anyhow.

Q. And—

A. They said they was going to—I would be billed for the additional premium.

Q. Were you eventually billed for that?

A. Yes.

Q. You were billed for the additional premium and did you continue the Ajo run then?

A. The Ajo run was given up the first of April.

Q. Did you go back and get your insurance changed or are you still—

A. I told them to change it but—I thought they had but it was pointed out in your office this morning that it is still set commercial on the premium notice.

Q. When did you call them and tell them you were no longer doing the Ajo run?

A. After we had given it up, the first part of April."

■ We cannot accept Preferred Risk's argument that the trial court, as the trier of fact, could have accepted Mr. Reed's testimony and rejected Mr. Keplinger's. There is documentary evidence, namely the amended declarations, which show that the insurance policy was changed from "pleasure and business" (the use prior to the accident) to "commercial" (after the acci-

dent). In the face of this evidence, the trial court could not find that Preferred Risk would not have provided coverage for the hazard which caused the loss. Consequently, the Keplingers were entitled to a declaration in their favor as to coverage by the Preferred Risk policy.

The judgment is affirmed as to Mid-Century and reversed as to Preferred Risk. The cause is remanded with directions to enter an appropriate judgment in favor of the Keplingers as to Preferred Risk's coverage.

HATHAWAY and WREN, JJ., concur.