763 P.2d 251

**SECURITY INSURANCE COMPANY OF HARTFORD, a Connecticut corporation, Plaintiff–Appellee, Cross–Appellant,**

v.

**Darryl Don ANDERSEN, as Trustee of the Don Thomas Andersen Living Trust; Darryl Don Andersen, Dana Lyle Andersen, Boyce Andersen and Lorene Sorensen, children of Don Thomas Andersen, deceased; Robert Wilson, Special Administrator of the Estate of Don Thomas Andersen, deceased; Mary Jean Alder, surviving spouse of Paul Jeffrey Alder, deceased, Trustee of the Paul J. Alder Living Trust, and as natural parent and next friend of Dustin Alder, Lori Alder, and Rohn Alder, children of Paul Jeffrey Alder, deceased; Francis M. Cooper, surviving spouse of Forrest W. Cooper, Jr., deceased, Trustee of the Forrest W. Cooper, Jr., Living Trust, and personal representative of the Estate of Forrest W. Cooper, Jr., deceased, Defendants–Appellants, Cross–Appellees.**

No. 1 CA–CIV 8041.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 16, 1986.

Beer & Toone, P.C. by Donald P. Roelke and Thomas L. Toone, Phoenix, for plaintiff-appellee, cross-appellant.

Andersen, Schatz & Ryan by Thomas M. Ryan and Joe V. Andersen, Chandler, for defendant-appellant, cross-appellee Andersen.

Teilborg, Sanders & Parks by David J. Damron and Coni Rae Good, Phoenix, for defendant-appellant, cross-appellee Alder.

Miller & Pitt, P.C. by John L. Tully, Tucson, for defendant-appellant, cross-appellee Cooper.

## OPINION

GREER, Presiding Judge.

Appellants are the personal representatives and surviving relatives of the three men killed in the airplane crash out of which this action arose. They seek reversal of the trial court's summary judgment ruling that the aircraft liability policy issued by appellee Security Insurance Company of Hartford (Security) to decedent Don Thomas Andersen excluded coverage for the crash because Andersen failed to meet the requirements of the policy's "approved pilots" endorsement. On cross appeal, Security attacks the trial court's earlier ruling that coverage under the policy was not excluded on the ground that the crash occurred during IFR (Instrument Flight Rules) operation, for which Andersen was not rated. Security also challenges the trial court's refusal to grant its application for an award of attorney's fees pursuant to A.R.S. § 12-341.01.

The appeal presents the following issues for our consideration: (1) whether Security was estopped to deny coverage; (2) whether under the circumstances of the issuance of the policy Security was bound by Andersen's "reasonable expectations" concerning the coverage he was purchasing, pursuant to *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984); and (3) whether under Arizona law the facts that bring a case within a coverage exclusion in an aircraft liability policy must be causally connected to the accident in question before the exclusion may be given effect. Security's cross appeal raises two additional issues: (4) whether the trial court erred in holding that Andersen was properly rated for the flight that resulted in the crash; and (5) whether the trial court abused its discretion in denying Security an award of attorney's fees under A.R.S. § 12-341.01.

### FACTS

The facts essential to our resolution of the foregoing issues are undisputed. Don T. Andersen, the insured, owned a Cessna 210 airplane which later crashed and gave rise to this litigation. In July of 1981, Andersen contacted Walter Vance of Valley Insurance Associates in order to obtain aircraft liability coverage to commence when his current policy expired on August 31, 1981. Vance in turn contacted Carroll and Associates, Inc. (Carroll), an independent insurance agency in Tempe, Arizona, to obtain the required insurance. Over the telephone, Vance told Carroll employee Karen Lehman about the Cessna 210, Andersen's pilot certificate and ratings, his total logged hours, and his prior accident history. The "quote sheet" Lehman prepared based on that conversation neither called for nor included information concerning the status of the proposed pilot's medical certificate.

On July 30, 1981 Lehman called Vance and quoted an annual premium of $1,989 for an aircraft policy to be underwritten by Security and issued through Aerospace Managers Agency, Inc. Thereafter Lehman mailed Vance an aviation insurance application. The application requested no information concerning the proposed pilot's medical certificate. Andersen signed the application on August 27, 1981, and it was returned to Carroll. On August 31, 1981, Carroll issued a written binder and sent it to Andersen at Valley Insurance Associates' address. The binder included no reference to a medical certificate requirement. It provided in pertinent part:

> APPROVED PILOTS: Don Andersen and any private pilot or better with 750 total hours of which 250 hours were in

retractable gear aircraft and 25 hours in make and model insured.

Security issued Andersen's policy on September 9, 1981 and mailed it to Carroll. On September 24, 1981 Carroll mailed the policy to Andersen at the address for Valley Insurance Associates. By October 6, 1981, the date of the accident, Vance had not yet forwarded the policy to Andersen.

The "approved pilots endorsement" of Andersen's policy provided in pertinent part as follows:

> In consideration of the premium for which this Policy is written, it is understood and agreed that the coverage afforded by this Policy shall apply only while the aircraft is operated in flight by the pilot(s) designated below and then only if the said pilot(s) is properly certificated and rated by the FAA as shown below, has the minimum flying experience, all as indicated below, and in addition holds a valid and current medical certificate of the appropriate class:
>
> (1) Don T. Anderson [sic] providing he holds a certificate designating him as a: Private Pilot WITH THE FOLLOWING RATING(S): Single—Engine Land.

The "exclusions" portion of Andersen's policy provided in part:

> This Policy does not apply and no coverage is afforded:
>
> * * * * * *
>
> 2. While the aircraft is in flight:
>
> * * * * * *
>
> b. If piloted by a person not properly certificated, rated and qualified under the current applicable Federal Air Regulations for the operation involved whether said pilot is designated in the Declarations or endorsed hereon or not....

At the time of the accident, 14 C.F.R. § 61.3(C) provided in relevant part:

> C. *Medical certificate.* except for free balloon pilots piloting balloons and glider pilots piloting gliders, no person may act as pilot in command or in any other capacity as a required pilot flight crew member of an aircraft under a certificate issued to him under this part, unless he has in his personal possession an appropriate current medical certificate issued under part 67 of this chapter.

*See also* 14 C.F.R. § 61.23(c). In fact, Andersen held no valid, current medical certificate at any time relevant to this litigation. His previous certificate expired on May 30, 1981. It is undisputed that Andersen did not renew it, and there is no evidence concerning the reason he did not.

On October 4, 1981, decedents Don T. Andersen, Paul Jeffrey Alder and Forrest W. Cooper, Jr. flew in Andersen's Cessna 210 from Arizona to Stephenville, Texas to attend a farming seminar at the Texas A & M University research center. At approximately 9:40 a.m. on October 6, 1981, the three took off northbound from the Stephenville airport on a return flight to Arizona, which was to have included stops at Seminole, Texas and Portales, New Mexico to visit peanut farms. When the Cessna 210 took off, the weather at Stephenville was clear and the visibility was good. C.L. Castilaw, a pilot who left the Stephenville airport on a northward flight shortly after the Andersen party, obtained two weather briefings before he took off. He stated:

> I got one at 7:00 a.m. from Abilene Flight Service. There [sic] were reporting 9,000 feet broken with 10 miles visibility. At 9:00 a.m. I got a weather briefing from Ft. Worth Flight Service that told me that Abilene was reporting 900 feet overcast with one half mile visibility with rain or fog and drizzle.[1]

Castilaw further stated:

> Q. Alright, after you departed the Stephenville area did you encounter any weather conditions?
>
> A. Yes we did about twenty—I think it would be about twenty two or twenty three miles north of the airport there, we ran into that weather front, and it was very visible. It was just a solid cloud cover from as

1. The parties have informed this court by stipulation that they agreed below that the trial court could consider the unsworn statements of C.L. Castilaw and Dale Wilson in resolving appellants Alder and Cooper's motion for partial summary judgment.

far as—as high as you could see all the way to the ground, you couldn't see the Interstate, that's how heavy it was.

Q. Okay, that appears to you to be IFR weather conditions?

A. Yes, I turned around and went back to Stephenville and tied my airplane down. Because I knew the weather front was moving, you know, I'd picked it up from both weather stations.

Concerning the Andersen flight, farmer Dale Wilson of Baird, Texas stated:

> This statement concerns an incident which occurred at approximately 10:15 a.m. on Tuesday, October 6, 1981. At the time of the incident, I was located in the yard behind my residence where I was cutting wood. The weather at the time of the incident was extremely poor as the result of a very heavy fog which moved into the area from the north. A light mist was also falling at the time. Lateral visibility was extremely poor and restricted to approximately one thousand to one thousand five hundred feet which is the approximate distance from my location to a nearby stock tank. I estimated that the cloud ceiling at the time was approximately five hundred feet above the ground. As I was cutting wood in my backyard, I heard an aircraft approaching from the southeast. I was unable to see the aircraft. However, I heard the aircraft's engine which sounded as thought [sic] it were operating normally. I continued to look for the aircraft which sounded as though it made three descending passes as if it were in a nose dive. After each pass, the aircraft circled and descended in approximately the same location each time. On both the first and second pass, it clearly sounded as if the aircraft had a substantial amount of power. On the third pass the aircraft crashed into a field located approximately fifteen hundred yards to the east of my house. I looked into the clouds in an attempt to see the aircraft as it made each pass near my location. However, as a result of the extremely poor visibility and low ceiling, I was unable to see the aircraft even after it crashed approximately fifteen hundred yards from my location. Prior to the aircraft crashing, the engine sounded as though it were operating normally and during the first two descending passes, it sounded as though the engine was developing a substantial amount of power. On the third pass, the engine sounded as though it were developing substantial power. However, it sounded as though the power were reduced just prior to impact. I arrived at the accident site approximately five minutes after impact and discovered that the aircraft had been almost completely destroyed and was burning. I also determined that there were three occupants of the aircraft, each of which sustained immediate traumatic, fatal injuries.

Appellants Andersen submitted an affidavit from Joseph D. Caten, M.D., who performed complete physical examinations of Don Andersen over a ten-year period. Dr. Caten stated he had visited with Andersen in August of 1981, and that it was obvious to him that his general medical condition was excellent. Dr. Caten further expressed the opinion that on October 6, 1981 Andersen was in excellent physical, mental and emotional health. Neither party adduced any other evidence in the trial court concerning whether the crash was caused or contributed to by any medical condition or event affecting Andersen.

After the accident, Security's adjusters discovered that Andersen had not had a valid and current medical certificate at the time of the accident. On November 4, 1981 Aerospace Managers Agency, Inc. wrote to Andersen's estate reserving the right to contest coverage on the ground that Andersen held no valid and current medical certificate at the time of the accident and was not properly certificated and rated for a flight operation under IFR conditions.

On November 18, 1981 Carroll and Associates, Inc. received from Andersen's estate a written request to cancel the aircraft liability policy effective October 7, 1981, the day after the fatal crash. The request

was made on a "cancellation request/policy release" form. Carroll forwarded the form to Aerospace Managers Agency, Inc. on November 18, 1981. The letter of transmittal stated:

> Enclosed please find a lost policy release form for the above captioned insured. Please cancel the policy effective 10-7-81 as the aircraft has been totaled. Thank you.

Aerospace Managers Agency, Inc. refunded the sum of $1,476.74 to Andersen's estate through Carroll and Valley Insurance Associates based on the cancellation request. No request for a refund of the remainder of the premium, covering the period from August 31, 1981 through October 6, 1981, was ever made.

After the accident, appellants Alder and Cooper brought wrongful death actions against the Andersen estate and the Don T. Andersen Living Trust. Security defended these actions under its reservation of rights letter and in November of 1982, brought this declaratory judgment action. The instant appeal and cross appeal followed the trial court's resolution of the action by summary judgment. We have jurisdiction pursuant to A.R.S. § 12-2101(B).

PREMIUM ESTOPPEL

We first consider appellants' contention that Security is estopped to deny coverage for the accident or has waived its right to claim that no coverage existed. Appellants note that in response to the Andersen estate's request for cancellation of the policy and return of premiums, Security refunded only that portion of the premium covering the period following the fatal accident. Appellants reason that Security is therefore barred from claiming that the policy did not afford liability coverage for claims arising out of that accident. We cannot agree. Appellants assert that Andersen's estate requested "the return of all unearned premiums." In actuality, the "cancellation request/policy release" form submitted by the estate requested cancellation of the policy effective October 7, 1981, the date following the accident, and stated: "Any premium adjustment will be made in accordance with the terms and conditions of the policy." This can hardly be construed as a request by the estate for a return of "all unearned premiums." Contrary to appellants' implicit contention, Security was never presented with an unequivocal assertion by appellants that no part of the premium had been earned.

Appellants also appear to assume that the only event to which coverage could have extended was the fatal accident itself. They accordingly argue that the premiums Security retained must necessarily have purchased coverage for the accident and that by retaining the premiums Security waived any claim that the accident was not covered. The flaw in appellants' reasoning is apparent. As Security points out, Andersen's policy also covered the aircraft while it was parked and provided liability coverage while the aircraft was operated by qualified pilots other than Andersen. A policy may clearly afford protection according to its terms even when no covered event has in fact occurred. Security's retention of premiums for the period from the inception of the policy through October 6, 1981 cannot be construed as a waiver of its contention that the policy did not afford coverage for the accident in question.

Nothing was produced in this case that tended to establish an estoppel. There was no evidence that Security induced Andersen to believe he would have insurance coverage while flying without a valid medical certificate, or that Andersen deliberately failed to renew his medical certificate as a result of any such belief. *See generally, Joy Enterprises, Inc. v. Reppel,* 112 Ariz. 42, 537 P.2d 591 (1975). Appellants' reliance on *Collier v. General Exch. Ins. Corp.,* 58 Ariz. 122, 118 P.2d 74 (1941) and *Great American Reserve Ins. Co. of Dallas v. Strain,* 377 P.2d 583 (Okla.1962) is misplaced. In *Collier* the insurer became aware of a ground for avoiding the policy before the accident occurred, and nevertheless took the position that it would continue to earn premiums until the policy was actually surrendered to it. In contrast, Security did not become aware of a ground for avoiding coverage of the accident in this

case until after it had occurred, and was entitled to retain premiums for the period of the accident in return for non-excluded coverage it had provided. *Great American* is similarly distinguishable. As in *Collier,* the insurer in *Great American* contended not that a particular incident was excluded from the policy's coverage, but rather that the entire policy was invalid from the beginning. Unlike the situation in the instant case, the insurer's retention of the premium under those circumstances could properly be construed both as a waiver and an estoppel in pais. The trial court did not err in rejecting appellants' contention.

REASONABLE EXPECTATIONS

We next consider appellants' contention that Andersen had a reasonable expectation that Security's policy would protect him while flying his aircraft, and that his estate is entitled to the benefit thereof pursuant to *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984). Appellants note that *Darner* adopted *Restatement (Second) of Contracts* § 211 as a general framework for interpreting and enforcing standardized agreements with boilerplate provisions that are not negotiated and often not even read by the parties. Appellants specifically rely on subsection 3 of § 211, which provides:

> Where the other party has reason to believe that the party manifesting ... assent [to an unread and unnegotiated term of a standardized agreement] would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.

Appellants further rely on the following portion of comment (f) to § 211, quoted as follows by the *Darner* court:

> Although customers typically adhere to standarized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation.... [An insured] who adheres to the [insurer's] standard terms does not assent to a term if the [insurer] has reason to believe that the [insured] would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman.

140 Ariz. 383, 391–92, 682 P.2d 388. *See also, State Farm Mut. Auto Ins. Co. v. Bogart,* 149 Ariz. 145, 717 P.2d 449 (1986). The essence of appellants' argument is that the dominant purpose of the transaction between Andersen and Security was to afford Andersen bodily injury, property damage and liability coverage while he was flying his airplane. Appellants reason that because Andersen had no valid, current medical certificate, the boilerplate policy provision that required the pilot of the insured aircraft to have such a certificate eliminated the dominant purpose of the transaction. Appellants conclude that under *Restatement (Second) of Contracts* § 211(3), as applied by *Darner,* the policy must be enforced without the offending provision.

Appellants' analysis is defective in several respects. We note initially that unlike *Darner,* this is not a case in which there is evidence that the coverage afforded by the standard form policy differed from the coverage as represented to the insured by the insurer's agent. Further, appellants' reasoning in this case would expand *Darner* far beyond its broadest legitimate reading. Under *Restatement (Second) of Contracts* § 211(3) as applied by *Darner* to the standard insurance transaction, a boilerplate term in an insurance policy is to be negated only where the insurer has "reason to be-

lieve" that the insured would not accept the policy as a whole if he knew it contained the particular term in question. It is true that comment (f) to § 211(3) indicates that such "reason to believe" may be inferred from the fact that the term in question "eliminates the dominant purpose of the transaction." It is also true, however, that the "reason to believe" on which the analysis focuses is that of the insurer, and accordingly it would make no sense at all to infer such a "reason to believe" from circumstances of which the insurer has no knowledge.

That is precisely the situation here. Although Andersen's failure to renew his medical certificate certainly frustrated his dominant purpose in purchasing aircraft liability coverage from Security, there is no evidence that Security or its agents knew or even had reason to know that this was so. Indeed, because Federal law requires pilots to hold valid, current medical certificates to fly their planes legally, Security could justifiably have taken it as a given that Andersen would have such a certificate before operating the insured aircraft. Security had no reason to believe that Andersen would not have assented to the terms of the policy as a whole if he had known it contained a term requiring him to have a valid, current medical certificate when piloting the insured aircraft. The *Darner* rule thus does not preclude enforcement of that term.

Appellants nevertheless argue that under *Darner* an insurance carrier has a duty "to discern and inform the customer of any provisions in the policy that are contrary to the customer's intent in entering into the transaction ..." In support of this proposition they cite *Harr v. Allstate Ins. Co.*, 54 N.J. 287, 255 A.2d 208 (1969), and the following language from Justice Cameron's opinion specially concurring in *Darner:*

> Through today's decision we adopt a more rational set of rules as a basis for interpretation and, in addition, subject form contracts to the same rules of construction as all others. Where there is an expressed intent, it will be given effect. Where the "boilerplate" conflicts with the intent it will not be enforced. The agent must inform the customer if there is something in the "boilerplate" that is contrary to the expressed intent of the parties or the purpose of the transaction.

140 Ariz. 383, 400–01, 682 P.2d 388, 405–06. Neither citation supports appellants' argument. In *Harr* the policy as issued differed from the terms the insured negotiated with the insurer's agent in purchasing the policy. *Harr* does not hold that the insurer must obtain from the insured every bit of information that might conceivably bear on any provision of the policy being sold. Further, the quoted language from Justice Cameron's special concurrence merely notes that under the *Darner* rule an insurer's agent must alert his customer to any term in the standard insurance policy that is contrary to what the agent knows to be the purpose of the transaction. Contrary to the thrust of appellants' argument, *Darner* does not require insurers to read their insureds' minds.

CAUSAL CONNECTION

■ We next consider appellants' argument that the trial court erred in holding that aviation insurance coverage may be denied under an applicable exclusion even where the excluded risk had no causal connection with the particular loss suffered by the insured. The question presented is one of first impression in this state.[2] Appellants urge us to adopt a rule requiring the insurer to prove the existence of such a causal connection. They reason that such a rule would prevent arbitrary and inequitable forfeiture of insurance coverage, restrict enforcement of insurance exclusion clauses to those circumstances they were designed to address, and prevent insurers from reaping inappropriate windfalls. On the other hand, Security argues that adoption of such a rule would encourage courts effectively to rewrite unambiguous insur-

2. Neither *Ranger Ins. Co. v. Phillips*, 25 Ariz. App. 426, 544 P.2d 250 (1976) nor *Pacific Indem. Co. v. Kohlhase*, 9 Ariz.App. 595, 455 P.2d 277 (1969), cited and discussed by the parties, actually considered this issue.

ance contracts, change the overall risks undertaken by the insurer in return for the contracted premium, and encourage insureds to ignore and violate legal requirements governing aviation safety.

The question before us has been much litigated in other jurisdictions. The decided cases are vigorously and irreconcilably in disagreement. The majority view holds that a provision excluding coverage due to a violation of Federal aviation safety requirements will be enforced notwithstanding the absence of a causal connection between the excluded risk and the particular loss. *Hollywood Flying Serv., Inc. v. Compass Ins. Co.,* 597 F.2d 507 (5th Cir. 1979); *Bequette v. National Ins. Underwriters, Inc.,* 429 F.2d 896 (9th Cir.1970); *Arnold v. Globe Indem. Co.,* 416 F.2d 119 (6th Cir.1969); *Bruce v. Lumbermens Mut. Cas. Co.,* 222 F.2d 642 (4th Cir.1955); *Ideal Mut. Ins. Co. v. Lucas,* 593 F.Supp. 466 (N.D.Ga.1983); *DiSanto v. Enstrom Helicopter Corp.,* 489 F.Supp. 1352 (E.D.Pa. 1980); *Glades Flying Club v. Americas Aviation & Marine Ins. Co.,* 235 So.2d 18 (Fla.App.1970); *Grigsby v. Houston Fire & Cas. Ins. Co.,* 113 Ga.App. 572, 148 S.E.2d 925 (1966); *Western Food Products Co., Inc. v. U.S. Fire Ins. Co.,* 10 Kan.App.2d 375, 699 P.2d 579 (1985); *Aetna Cas. & Surety Co. v. Urner,* 264 Md. 660, 287 A.2d 764 (1972); *Macalco, Inc. v. Gulf Ins. Co.,* 550 S.W.2d 883 (Mo.App.1977); *Omaha Skydivers Parachute Club, Inc. v. Ranger Ins. Co.,* 189 Neb. 610, 204 N.W.2d 162 (1973); *Security Mut. Cas. Co. v. O'Brien,* 99 N.M. 638, 662 P.2d 639 (1983); *Baker v. Insurance Co. of North America,* 10 N.C. App. 605, 179 S.E.2d 892 (1971). The court in *Bruce v. Lumbermens Mut. Cas. Co., supra,* stated the rationale for that rule as follows:

> The clear meaning of the policy is not as the appellant suggests that the risk is excluded if the injury is caused by a violation of the regulations, but that the risk is excluded if the injury is caused by the operation of the plane *while* it is being used in violation of the regulation. It is established by the great preponderance of authority in the decisions of this and other courts that an insurer need not show a causal connection between the breach of an exclusion clause and the accident, if the terms of the policy are clear and unambiguous, since the rights of the insured flow from the contract of insurance and not from a claim arising in tort. [Citation omitted].

222 F.2d 642, 645. In *Grigsby v. Houston Fire & Cas. Ins. Co., supra,* the court stated:

> It is immaterial that the excluded use may not have been the cause of the loss, nor does it matter that the insured did not know that the pilot had failed to meet the requirements of the regulations. The duty is on the insured to know that the aircraft is being operated within the regulations.

148 S.E.2d 925, 927. In *Security Mut. Cas. Co. v. O'Brien, supra,* the court noted:

> To hold otherwise would allow courts to ignore the plain language of insurance policy exclusions whenever they feel an insurer should not be allowed to avoid liability for an accident unrelated to a policy exclusion. This rationale is contrary to substantial legal precedent as well as longstanding public policy. Insurance coverage must not be afforded aircraft owners who ignore or refuse to comply with established certification requirements commonly part of policy exclusions.

662 P.2d 639, 641.

The minority view holds that an insurer cannot enforce a policy exclusion based on noncompliance with aviation regulations without demonstrating a causal relationship between the violation in question and the actual loss incurred. *Bayers v. Omni Aviation Managers, Inc.,* 510 F.Supp. 1204 (D.Mont.1981); *American States Ins. Co. v. Byerly Aviation, Inc.,* 456 F.Supp. 967 (S.D.Ill.1978); *Avemco Ins. Co. v. Chung,* 388 F.Supp. 142 (D.Haw.1975); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936 (Tex. 1984); *South Carolina Ins. Co. v. Collins,* 269 S.C. 282, 237 S.E.2d 358 (1977). In *Bayers v. Omni Aviation Managers, Inc.,* the court stated:

> In the case at bar it is undisputed that the alleged breach of the policy conditions had nothing to do with the accident. To deny the insured the coverage he had

> paid for where merely a technical breach occurred would be unfair. The company inserted the medical certificate provision to guard against the risk of loss which arises where a person of bad health pilots an aircraft. In this case, [the insured's] lack of medical certification did not increase the risk of loss to the company, and the insured's coverage will not be forfeited because of an alleged technical breach of the policy. Were this court to interpret the policy otherwise, plaintiff would suffer a forfeiture of his protection, a result disfavored in Montana law.

510 F.Supp. 1204, 1207–08. The court in *American States Ins. Co. v. Byerly Aviation, Inc., supra,* noted:

> [I]t is apparent that the exposure undertaken for indemnity, on which premiums are based, is not directly involved at all when a policy exclusion happens to become involved which has nothing to do with the loss.

456 F.Supp. 964, 970.

*O'Connor v. Proprietors Ins. Co.,* 696 P.2d 282 (Colo.1985), the most recent decision in the minority line, held that an exclusion for accidents occurring while the covered aircraft was operated in violation of its airworthiness certificate could be overridden on public policy grounds to avoid a forfeiture, but only if the insured could show that the violation of the regulation was not a cause of the accident. As the court stated in *O'Connor:*

> The use of the equitable doctrine against forfeiture of coverage to override clear and unambiguous forfeiture provisions in an insurance policy should not be invoked except under the most compelling circumstances. Where the relationship of the regulation to safety is not apparent, the insured has the burden of showing the absence of such a relationship. Furthermore, when the regulation is clearly or implicitly safety-related, the application of the exclusion should be precluded by public policy only when the insured can show that the violation of the regulation was not a cause of the accident.

696 P.2d 282, 286.

In our opinion the minority rule, as modified by *O'Connor,* is more consistent with Arizona law. Our supreme court recognized in *Kepner v. Western Fire Ins. Co.,* 109 Ariz. 329, 509 P.2d 222 (1973) that an insurance company's right to limit its liability and impose conditions and restrictions on its contractual obligations is limited by considerations of public policy. In *Lindus v. Northern Ins. Co.,* 103 Ariz. 160, 438 P.2d 311 (1968), the court held that an insurance company could not prevail on a coverage issue based on an insured's delay in giving it notice of a claim, even where notice was an express condition precedent to coverage, where the insurer failed to prove actual prejudice due to the delay. Similarly, in *Zuckerman v. Transamerica Ins. Co.,* 133 Ariz. 139, 650 P.2d 441 (1982), the court held that while a policy provision shortening the applicable statutory period for bringing an action on an insurance policy is valid under A.R.S. § 20–1115(A)(3),

> ... the insurer may be estopped from raising a defense based upon such an adhesive clause where the enforcement of the clause would work an unjust forfeiture. The key factor in the determination of this issue is the question of whether the insurer has shown prejudice by reason of the delay in filing suit. In the absence of such a showing, it is fair to say that the purpose for which the insurer was given permission to insert the clause will not be served by its enforcement.

133 Ariz. 139, 146, 650 P.2d 441, 448. *See also California State Life Ins. Co. v. Fuqua,* 40 Ariz. 148, 10 P.2d 958 (1932); *Jordan v. Logia Suprema,* 23 Ariz. 584, 206 P. 162 (1922); *Keplinger v. Mid-Century Ins. Co.,* 115 Ariz. 387, 565 P.2d 893 (App. 1977); *Central Nat'l Life Ins. Co. v. Peterson,* 23 Ariz.App. 4, 529 P.2d 1213 (1975). *Cf. Baumler v. State Farm Mut. Auto Ins. Co.,* 493 F.2d 130 (9th Cir.1974) (to establish defense of noncooperation, insurer must demonstrate that in good faith it was actually hampered in its defense by the insured's noncooperation). The foregoing decisions make clear that while insurers may lawfully limit the scope of the coverage they extend, Arizona courts will

not enforce what amount to arbitrary forfeitures of insurance coverage for purely technical reasons beyond those necessary to protect insurers' legitimate interests. We also agree with the Colorado Supreme Court, however, that where a coverage exclusion is based on a violation of a safety regulation, public policy requires that application of the exclusion be precluded only where the insured can show that the violation of the regulation was not a cause of the particular loss in question. In the instant case, appellants Andersen produced the uncontroverted affidavit of Joseph D. Caten, M.D. in order to establish the good health of Andersen on the date of the accident. Furthermore, we note that Security has conceded in its opening brief on cross-appeal that the crash was caused by pilot misconduct:

> Here, Don T. Andersen knew before he took off that he would need to fly into IFR conditions ... Nevertheless, he took off and intentionally flew directly into such weather in direct violation of 14 C.F.R. § 61.3(E). *"As a result of such conduct, he lost control of the aircraft and crashed."*

(Emphasis added). We accordingly hold that, for purposes of remand, appellant has established that Andersen's failure to comply with the safety regulation in no way contributed to the accident in question and that Security has not been prejudiced by Andersen's noncompliance.

SECURITY'S CROSS APPEAL

On cross appeal, Security argues that it was error for the trial court to characterize the flight as VFR based solely on the fact that VFR conditions existed at the time and place of departure from the Stephenville airport.[3] Appellants contend, however, that the trial court's approach to the problem of IFR/VFR classification was proper, citing *Glover v. National Ins. Underwriters,* 545 S.W.2d 755 (Tex.1977) and *Northwestern Flyers, Inc. v. Olson Bros. Mfg. Co.,* 679 F.2d 1264 (8th Cir.1982). In *Glover* the pilot did not know when he took off that he was flying into instrument flight rules (IFR) weather. *Supra,* at 763. In *U.S. Fire Ins. v. Marr's Short Stop of Texas,* 680 S.W.2d 3 (Tex.1984) the Supreme Court of Texas reconsidered the importance of pilot knowledge at the inception of the flight. In *Marr's Short Stop* the pilot, "at the inception of his flight, knew he would be flying into IFR weather conditions." *Id.* at 6. The court concluded that the pilot's knowledge of IFR weather conditions along his flight path meant that his flight would be characterized as an IFR flight and would preclude recovery under the policy. Thus, "After *Glover* and *Marr's Short Stop* it is clear that pilot knowledge is at least a factor that a court must consider in characterizing a flight as IFR or VFR under the inception rule." *Ideal Mut. Ins. Co. v. Myers,* 789 F.2d 1196, 1204 (5th Cir.1986).

We therefore adopt for Arizona what we believe to be the more rational approach to the problem as expressed in the concurring opinion of Justice Spear in *Marr's Short Stop, supra,* at 6.

> The determination of whether a flight is IFR or VFR should be made by the trier of fact on the basis of weather reports and forecasts of the expected weather conditions along the entire plan of flight which were *available* to the pilot at the time and place of departure. If the forecasts indicate that the pilot must fly through IFR conditions to reach his destination, it is an IFR flight.

This rule avoids the injustice of characterizing a flight as VFR based on conditions in the departure area where IFR conditions could reasonably be anticipated along the pilot's intended route. The rule also avoids the injustice of characterizing a flight as IFR based solely on unexpected changes in the weather.

In the instant case the trial court disregarded conflicting evidence concerning weather conditions that could reasonably have been anticipated over the course of Andersen's flight based on available information and instead ruled that the flight was VFR because it commenced under VFR conditions. We accordingly remand

3. The trial court stated in its minute entry of January 11, 1984: "The court ... finds there are no issues of material fact by reason of visual flight rules [VFR] existing at the time of take off."

442

for trial on the question of whether IFR conditions could reasonably have been anticipated along Andersen's planned route based on weather reports, forecasts or other information available at the Stephenville airport at the time of Andersen's departure. Since there is no evidence that Andersen received additional weather information after takeoff, we do not reach the issue of a pilot's duty if information becomes available during the flight that changes the conditions along the flight plan to IFR weather.

Security has also attacked the trial court's decision to deny it an award of attorney's fees pursuant to A.R.S. § 12–341.01. In view of our disposition herein, we vacate the trial court's ruling on Security's request for attorney's fees without prejudice to redetermination of that request after trial. In our discretion, we deny the parties' requests for attorneys' fees on appeal.

Reversed and remanded for proceedings consistent with this opinion.

MEYERSON and KLEINSCHMIDT, JJ., concur.