742 P.2d 277

Tina Marie GORDINIER, a single woman, Plaintiff-Appellant,

v.

The AETNA CASUALTY & SURETY COMPANY, a foreign corporation, Defendant-Appellee.

Tina Marie GORDINIER, a single woman, Plaintiff-Appellant,

v.

WESTERN AMERICAN INSURANCE AGENCY, an Arizona corporation; Vada Jean Gordinier and John Doe Gordinier, wife and husband, Defendants-Appellees.

No. CV–86–0609–PR.

Supreme Court of Arizona.

July 28, 1987.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Larry

L. Smith, Robert G. Beshears, Phoenix, for defendant-appellee The Aetna Cas. & Sur. Co.

Jennings, Strouss & Salmon by Jefferson L. Lankford, M. Byron Lewis, William T. Birmingham, Phoenix, for defendants-appellees Western American Ins. Agency and Gordinier.

Frederick C. Creasy, Jr., Michael E. Kranitz, Scottsdale, for plaintiff-appellant.

FELDMAN, Vice Chief Justice.

Plaintiff, Tina Marie Gordinier (Tina), has petitioned us to review a court of appeals opinion affirming summary judgment in favor of defendants, Aetna Casualty & Surety Company (Aetna), Western American Insurance Agency (Western), and Vada Jean Gordinier (Jean). *Gordinier v. Aetna Casualty & Surety Company*, 154 Ariz. 262, 742 P.2d 273 (consolidated) (App. 1986).

Aetna refused to pay uninsured motorist benefits to Tina when she was involved in an accident in an uninsured vehicle on the ground that she was not a "resident of the same household" as her husband, the named insured.

We granted review to clarify the scope of the doctrine of *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984). *See* Rule 23(c)(4), Ariz.R.Civ.App.P., 17A A.R.S. (Supp.1986). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

FACTS

The trial court granted summary judgment in favor of defendants. Therefore, we view the facts in the light most favorable to plaintiff. *See Farmers Insurance Co. v. Vagnozzi*, 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983).

Tina and Shawn Gordinier were married in 1981. In February 1982, while they were living together on Utopia Road in Phoenix, they asked Shawn's mother, Jean, to help them purchase automobile insurance for their only vehicle, a 1976 Buick. Jean, at that time a clerical employee with Aetna, arranged for Tina and Shawn to buy car insurance from Aetna through the Leiby agency. The extent of Jean's participation in obtaining the insurance is unclear from the record. On the application form, Shawn is listed as the applicant, and both Shawn and Tina are listed as drivers.[1] The application lists Shawn as ninety percent driver and Tina as ten percent driver of the Buick.

Tina and Shawn separated in August 1982 and left the home on Utopia Road. Shawn returned to his parents' home, while Tina and the couple's son, Max, moved into their own apartment. Shawn provided some financial support for Max, and told Tina that he would pay the premiums on the Aetna policy. From the date of the separation, Tina had nearly exclusive use of the insured Buick. When Shawn purchased a truck in May 1983, he asked his mother, who at that time was working at the Luhrs Insurance Agency, to help him add his truck to the Aetna coverage. Although aware that Tina and Shawn were no longer living together, Jean sent in the paperwork to amend the policy, apparently without notifying Aetna about the change in living arrangements. The record does not contain a copy of the 1983 policy, but the parties agree that Tina was listed as ninety percent driver of the Buick and ten percent driver of the truck. The policy described and covered both vehicles.

In depositions, Tina testified that both Shawn and Jean told her that she was fully covered by the policy.[2] Jean denied ever

1. The application requests "name of applicant" and contains one space to insert a name. Below, the application contains spaces for driver information, including all licensed operators' names, license numbers, birth dates, sex, social security numbers, and marital information.

2. In the court of appeals and in oral argument to us, Jean and Western argued that Tina had

not made out a prima facie case of misrepresentation against Jean and Western because the deposition containing Tina's claim that Jean had told her she was fully covered had not been filed with the superior court and thus was not part of the record on appeal. The court of appeals denied Tina's motion to add the deposition to the record. *See* Rule 11, Ariz.R.Civ. App.P., 17A A.R.S. The court of appeals' rea-

talking to Tina about her insurance coverage. Jean also testified that she never talked to Tina about the possibility that her insurance coverage would be jeopardized because she was no longer living with Shawn.

In September 1983, when the policy came up for renewal, Jean was employed as a clerical employee at Western American.[3] Jean transferred the policy to that agency to monitor the premiums due and to pay them if Shawn did not. She actually paid the September 1983 premium.

On January 8, 1984, sixteen months after Shawn and Tina had separated, Tina sustained serious injuries while riding as a passenger on an uninsured motorcycle owned and driven by a friend. At the time of the accident, Shawn and Tina still were living apart but had not filed for a legal separation or dissolution. Tina testified that she had not foreclosed the possibility of reconciling with Shawn. Shawn's mother also testified that she thought Shawn wanted a reconciliation. However, the couple never reconciled and eventually was divorced in June 1984.

After the accident, Tina filed a claim for uninsured motorist benefits with Aetna. Aetna denied the claim on the grounds that Tina was not a "covered person" for uninsured motorist coverage because she was not a named insured, was not a family member residing in the same household as Shawn at the time of the accident, and was not in a covered automobile.

After Aetna refused to pay uninsured motorist benefits, Tina sued the insurer for bad faith, breach of contract, fraud, breach of fiduciary duty, consumer fraud, deceptive advertising, intentional infliction of emotional distress, and violations of the state racketeering statute. She also sued Western and Jean for misrepresentation and bad faith, alleging that Jean had misrepresented that Tina had full coverage under the policy and had assisted in renewing the policy without change in September 1983, knowing that Tina and Shawn were living separately.

The trial court granted summary judgment in favor of Aetna, finding as a matter of law that Tina was neither a named insured nor a "resident of the same household" as Shawn. Without explanation, the court also granted summary judgment in favor of Western and Jean on the ground that there was no genuine issue of fact and they were entitled to judgment as a matter of law.

The court of appeals affirmed the grants of summary judgment. The court held that Aetna's requirement that a spouse be "a resident of the same household" to receive uninsured motorist coverage did not violate the statutory language or the policy of the Uninsured Motorist Act, A.R.S. § 20–259.01, and the Uniform Motor Vehicle Safety Responsibility Act, A.R.S.

soning in upholding the grant of summary judgment in favor of defendants was not based on the absence of the deposition from the record. Nevertheless, we believe we should comment on defendants' argument to provide some future guidance.

Unless ordered by the trial court, depositions are not filed with the court. See Rule 2.14, Local Rules of Practice for Maricopa Superior Court. They may, of course, be used to support motions. Id. Another rule provides that the required statement of facts in a motion for summary judgment must refer to the specific portion of the record where the fact may be found. Rule IV(f), Uniform Rules of Practice. Thus, diligent counsel seeking summary judgment will attach to the motion any supporting documentation that has not already been filed with the court.

In this case, we cannot tell from the record whether the trial judge had a copy of Tina's deposition while he was considering the motion for summary judgment. We do not consider this fact dispositive. In the statement of fact, Tina's counsel had cited to specific pages of her deposition. Jean and Western did not dispute the accuracy of Tina's statement of the contents of her deposition. We believe that upholding the grant of summary judgment on the basis that Tina had not made out a prima facie case of misrepresentation merely because her deposition testimony was not filed with the court would be excessively technical and would exalt form over substance.

3. As a clerical employee at Western, Jean did not give advice concerning coverage nor do any underwriting. Jean testified that she did not get any credit for transferring the policy to Western; credit went to another employee.

§§ 28–1101 to –1225. 154 Ariz. at 263–264, 742 P.2d at 274–275. We declined to review this issue. The court of appeals also held that Tina was not entitled to coverage based on the "reasonable expectations" doctrine of *Darner* because the phrase "resident of the same household" is unambiguous. *Id.* 154 Ariz. at 265, 742 P.2d at 276. In addition, the court disagreed that there was any disputed factual question whether Tina and Shawn were residents of the same household. *Id.* 154 Ariz. at 265, 742 P.2d at 276. The court affirmed the grant of summary judgment in favor of Western and Jean on the basis that Jean had no authority to act as an insurance agent. *Id.,* 154 Ariz. at 265, 742 P.2d at 276.

We accepted review to address the following issues:

1. Did the trial court err in holding as a matter of law that under the Aetna policy Tina did not have reasonable expectations of receiving uninsured motorist benefits?

2. Did the trial court err in holding as a matter of law that Tina was not a "resident of the same household" as Shawn?

3. Did the trial court err in granting summary judgment for Western and Jean Gordinier?

## I. REASONABLE EXPECTATIONS

### A. *Policy Provisions*

The trial court held that although the policy was in force at the time of Tina's accident, *she* was not covered under the uninsured motorist provisions for an accident that occurred while she was riding on a friend's uninsured vehicle. Aetna concedes that had Shawn been injured in an identical accident, he could have received policy benefits under both the uninsured motorist and medical pay provisions. Tina, however, would only have been covered

had she been in an accident while occupying the Buick or the truck. The disparate treatment of Shawn and Tina is reached under the following policy provisions. The 12–page policy provided in part (c) on page six:

> We will pay damages which a **covered person** is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury:
> (1) sustained by a **covered person**; and
> (2) caused by an accident....

Thus, Tina could recover uninsured motorist benefits only if she were a "covered person." Part (c) continued:

> "**Covered person**" as used in this part means: (1) you or any **family member.** (2) any other person **occupying your covered auto.**

Because Tina was not in the "covered auto" at the time she was hurt, she could recover uninsured motorist benefits as a covered person only if she was a "you" or a "family member" of a "you." The definitions section on page one of the policy, however, limited the common meaning of these terms.[4] "Throughout this policy," "you" means either "the named insured" shown on the declarations page or "the spouse [of the named insured] if a resident of the same household." The declarations page listed Tina as a driver, but only Shawn as the "named insured." Thus, Tina qualified as a "covered person" under the rubric of "you" only while she lived in "the same household" as Shawn.

Page six of the policy also indicated that Tina might qualify as a "covered person" for uninsured motorist coverage as a "family member." Again, resort to the definitions section on page one would have revealed that "family member means a person related to you ... who is a resident of your household." Bearing in mind that "you" only applied to Tina when residing in

---

**4.** Disputes over scope of coverage involve a variety of different types of policy provisions, all of which in some way define or identify the risks that are and are not being underwritten. Rahdert, *Reasonable Expectations Reconsidered,* 18 CONN.L.REV. 323, 351 (1986). Because of standardization, these provisions can be divided into distinct categories, such as insuring clauses, definitions, conditions, warranties, exceptions or exclusions, and special endorsements. Regardless of the category, each provision potentially may be used to restrict the scope of coverage. For instance, as is the case here, a definition can contain a restriction that could have been expressed as an exclusion. *Id.*

"the same household," Tina also did not qualify as a "family member" because she was not a resident of "your" (Shawn's) household.

In short, although uninsured motorist coverage is available for "covered persons," in a rather complicated way "covered persons" are limited to the named insured, a spouse residing in the same household, relatives of the named insured who reside in his or her household, and all other persons injured while in a covered auto. It is important to remember that Tina qualified under all these definitions when the policy was issued. Because she and Shawn were living together at that time, she was both a "you" and a "family member" and would have been covered if injured by an uninsured motorist no matter whether or not she had been riding in a covered automobile. The result of the definitional section of the policy when applied to the coverage clause of the uninsured motorist section was to take from Tina coverage that she had when the policy was issued. The precipitating event that eliminated some of Tina's coverage was the couple's move to different living quarters. Thus, although the record shows that premiums were calculated and paid for two drivers on two vehicles, Tina's coverage was less simply because Shawn, and not she, was listed as the named insured.

Apparently, some time after originally buying the Aetna policy, Tina and Shawn received the declarations page listing Shawn as "named insured." We do not know whether either examined the declarations. Tina concedes that she never read the Aetna policy, but she alleges that even if she had read it, she would not have understood the limitation at issue in this case. Aetna's policy is known in the insurance industry as an "easy read" policy. The clause at issue in this case is taken from a standard form developed by the Insurance Services Office. *See* 1 A. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, Appendix A—Personal Auto Insurance Standard Forms (2d ed. 1985). For now, we will accept Aetna's contention that its "easy read" personal auto policy unambiguously

excludes Tina from uninsured motorist coverage.

### B. *Purpose of the Policy Provisions*

The obvious purpose of extending coverage to family members residing in the same household is to cover those for whom the named insured naturally would wish to provide coverage, including his or her spouse, children, and other dependent relatives. *See United States Fidelity & Guaranty Co. v. Winkler*, 351 F.2d 685, 687–88 (8th Cir.), *cert. denied*, 382 U.S. 1026, 86 S.Ct. 647, 15 L.Ed.2d 540 (1965). *See generally* Annot., 36 A.L.R.4th 588, 589 (1985); Annot., 91 A.L.R.3d 1280, 1285 (1979). On the other hand, because the insurer naturally does not desire to cover every relative of its named insured, it limits the extension clause to residents of the insured's household. This limitation generally makes good sense in relation to a named insured's parents, children, brothers, sisters, and the like, but makes much less sense in relation to a spouse. Presumably, a husband and wife purchasing personal auto insurance intend to be covered to an equal extent.

In fact, because the extent of coverage may vary between named insureds and omnibus insureds, an automobile insurance buyer is "usually afforded an opportunity to specify that other persons—such as a spouse or children—are to be identified as named or designated insureds on the Declarations page of the policy." 1 A. WIDISS, *supra* § 4.4, at 59. Further, some insurers automatically identify all principal users of insured vehicles as named insureds. *Id.* The record in the case before us does not indicate why or how only Shawn was specified as the named insured.

### C. *The Effects of the Policy Provisions*

Aetna's construction of the policy, approved by the lower courts, has some strange and probably unexpected results. For instance, though Tina and Shawn presumably wished coextensive coverage when they purchased the policy, they somehow wound up receiving a lesser class of coverage for Tina. Because Tina and Shawn

were no longer living in the same household at the time of the accident, Tina was not covered for benefits to which Shawn would have been entitled. Although Tina and Shawn were paying to insure two cars and two drivers, a portion of Tina's uninsured motorist coverage was dependent on where she was living. In addition, Aetna acknowledged that when Shawn moved back to his parents' house, his parents and any siblings living in the same household *may* have become "family members" under the policy and thus would have been fully insured by Aetna to the same extent as Shawn.[5] The result: Shawn's brother and sister, but not his wife and child, might have been covered.

We turn, then, to Tina's first contention. She argues that the policy provisions limiting her uninsured motorist coverage are unenforceable under the *Darner* case.

### D. *The Darner Rule*

#### 1. *Standardized Forms*

Aetna's standard form automobile insurance policy is a contract of adhesion. Like the typical personal insurance policy, it

> [i]s not a contract arrived at by negotiation between the parties. The insured is given no choice regarding terms and conditions of coverage which are contained on forms which the insured seldom sees before purchase of the policy, which often are difficult to understand, and which usually are neither read nor expected to be read by either the person who sells the policy or the person who buys it.

*Zuckerman v. Transamerica Insurance Co.*, 133 Ariz. 139, 144, 650 P.2d 441, 446 (1982); *accord Darner*, 140 Ariz. at 393, 682 P.2d at 398; Restatement (Second) of Contracts § 211 comment b (1979)[6] (party who regularly uses standardized forms does not ordinarily expect customers to understand or even to read standard terms); Mayhew, *Reasonable Expectations: Seeking a Principled Application*, 13 PEPPERDINE L.REV. 267, 270–71 (1986); Rahdert, *Reasonable Expectations Reconsidered*, 18 CONN.L.REV. 323, 329 (1986); Slawson, *The New Meaning of Contract: The Transformation of Contracts Law by Standard Forms*, 46 U.PITT.L.REV. 21, 24–26 (1984); Note, *A Common Law Alternative to the Doctrine of Reasonable Expectations in the Construction of Insurance Contracts*, 57 N.Y.U.L.REV. 1175 (1982).[7] The adhesive terms generally are self-protective; their major purpose and effect often is to ensure that the drafting party will prevail if a dispute goes to court. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 HARV.L.REV. 1174, 1229, 1237 (1983); *see also* Rahdert, *supra*, 18 CONN.L.REV. at 341. Because the typical consumer buying insurance has not assented to the myriad of essentially invisible boilerplate terms in an adhesion contract, special contract rules should apply. Restatement § 211; Mayhew, *supra*, 13 PEPPERDINE L.REV. at 267; Rakoff, *supra;* Slawson, *supra;* Rahdert, *supra.*

#### 2. *Meaning of Darner*

Arizona recognizes that an adhesion contract is a different creature than the tradi-

---

**5.** Whether any relative living under the same roof would be covered is unclear. For example, had Shawn's mother been in an accident, the court or jury potentially could have found that there were two separate "households" at the address, and that Jean was a resident of her husband's household. *Cf. Heard v. Farmers Insurance Exchange Co.*, 17 Ariz.App. 193, 196, 496 P.2d 619, 622 (1972).

**6.** Hereafter, Restatement (Second) of Contracts will be referred to as Restatement § ____.

**7.** One commentator lists seven characteristics that define a model adhesion contract: (1) A printed form that contains many terms and purports to be a contract; (2) The form is drafted by one party to the transaction; (3) The drafting party participates in numerous transactions of the type represented by the form as a matter of routine; (4) The form is presented to the adhering party with the representation—explicit or implicit—that, except perhaps for a few identified terms, the drafting party will enter into the transaction only on the terms contained in the document; (5) After the parties have dickered over those terms that are open to bargaining, the adherent signs the document; (6) The adhering party enters into few transactions of the type represented by the form, at least in comparison with the drafting party; (7) The principal obligation of the adhering party in the transaction considered as a whole is the payment of money. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 HARV.L.REV. 1174, 1177 (1983).

tional bargained-for exchange of terms to which the courts apply the ordinary meeting-of-the-minds contract rules. *Darner, supra;* Note, *Insurance Law—Challenging Boilerplate Exclusions,* 1984 ARIZ.ST. L.J. 751. To enable the courts to treat standardized adhesion contracts realistically while maintaining some consistency, *Darner* adopted the Restatement (Second) of Contracts test governing the enforceability of boilerplate terms in an adhesion contract. The rule adopted recognizes "modern commercial practice by business entities which ... effect a large volume of transactions through use of standardized forms." *Darner,* 140 Ariz. at 393, 682 P.2d at 398. *Darner* allows businesses that use standardized forms to write their own terms for a transaction. Customers submit to these terms knowing that they are not and cannot be fully aware of them. *Id.* at 393–94, 682 P.2d at 398–99.

> However, [*Darner*] stops short of granting the drafter of the contract license to accomplish any result. It holds the drafter to good faith and terms which are conscionable; it requires drafting of provisions which can be understood if the customer does attempt to check on his rights; it does not give effect to boilerplate terms which are contrary to either the expressed agreement or the purpose of the transaction as known to the contracting parties.

*Id.* at 394, 682 P.2d at 399.

By adopting Restatement § 211 in *Darner,* we held that in proper circumstances an insured would be relieved from certain standardized clauses of agreements which had not been negotiated, providing they were clauses which, "because of the nature of the enterprise, customers will not be expected to read and over which they have no real power of negotiation." *Id.* at 394, 682 P.2d at 399. The grounds for such relief—somewhat vaguely referred to as the reasonable expectations doctrine—include the factors described in Restatement § 211 and *Darner.* Accordingly, under Restatement § 211, courts will enforce a boilerplate term unless the drafter had reason to believe that the adhering party would not have assented to the particular

term had he or she known of its presence. The drafter's reason to believe that the adhering party would not have assented to the term can be shown through prior negotiations or inferred from various facts. *See* Restatement § 211 comment f (cited extensively in *Darner* ).

Thus, the court of appeals erred when it held that *Darner* was inapplicable simply because the terms in question, taken by themselves, were unambiguous. Our cases show that the *Darner* methodology was not intended to be limited to the precise facts presented in that case (a boilerplate term that undercut the dickered deal) or to ambiguous contracts only. In *Zuckerman,* 133 Ariz. at 139, 650 P.2d at 441, a precursor of *Darner,* we refused to enforce an unambiguous special statute of limitations in a fire loss policy because the term was oppressive when used as a method to avoid payment of just claims. *See also State Farm Mutual Automobile Insurance Co. v. Bogart,* 149 Ariz. 145, 717 P.2d 449 (1986) ("other insurance" clause unenforceable because it defeated the insured's reasonable expectations); *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127 (as a matter of law, pamphlet given to insureds before they purchased insurance created expectations of coverage), *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982).

 These cases demonstrate our reliance on the doctrine of reasonable expectations to refuse enforcement even to unambiguous boilerplate terms. As a synthesis of the cases and authorities demonstrates, Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a *limited* variety of situations:

1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured (*see Bogart, supra; Wainscott v. Ossenkop,* 633 P.2d 237 (Alaska 1981) (application of "resident of same

household" definition, while not technically ambiguous, defeats reasonable expectations of spouse));

2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage (*see Zuckerman, supra* );

3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured (*see Sparks, supra* );

4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy (*see Darner, supra* ). *See* Mayhew, *supra,* 13 PEPPERDINE L.REV. at 287–89; *see also* A. WINDT, INSURANCE CLAIMS AND DISPUTES § 6.03, at 235–37 (1982); Birnbaum, Stahl, and West, *Standardized Agreements and the Parol Evidence Rule: Defining and Applying the Expectations Principle,* 26 ARIZ.L. REV. 793, 834–35 (1984).

E. *Application*

■ In supplemental briefs and at oral argument, Aetna said that Shawn automatically became the "named insured" by being the applicant. Nothing in the application form gives any notice that listing only one spouse as the applicant may result in unequal insurance coverage for the other. The record contains no details of the original insurance transaction. Therefore, we cannot tell who filled out the application, who was present; whether the whole or part of the transaction was done on the telephone, or whether any of the policy terms were discussed, bargained-for, or explained. We cannot tell whether an agent for Aetna ever informed Tina or Shawn of the significance of only one of them being a "named insured," or gave them both an opportunity to become named insureds. Authority suggests that insurers tend to use the husband as "named insured" merely as a matter of routine without considering the potential consequences. *USF & G,* 351 F.2d at 687–88. Aetna had the burden of supporting its motion for summary judgment. The record here shows only that Shawn signed an application for insurance on which he is listed as "applicant" and Tina is listed as an additional driver. From this transaction, Shawn became the "named insured" and, as a result, Aetna contends that Tina did not receive the same coverage as Shawn.

Several aspects of the *Darner* rule are implicated here. First, although the provisions in question may be unambiguous taken alone, we considerably doubt that the average customer attempting to check on his or her rights could readily understand them. The limitation was inconspicuous and was scattered over the policy. The average insured might not even notice that only one spouse had been designated a "named insured." *Hansen v. U.S.A.A. Casualty Insurance Co.,* 206 Neb. 147, 151, 291 N.W.2d 715, 720 (1980). Even if it were noticed, we believe the significance of such a classification would not be easily understood by any but the most experienced and sophisticated of customers.

Second, the provision resulting in disparate treatment of spouses certainly could be deemed unexpected or one that emasculates apparent coverage. When the policy first was issued, Tina was a "you"—a spouse of the named insured residing in the "same household." As long as Tina resided in the same household as Shawn, she *had* equal coverage status with Shawn. Because the two separated, whether unilaterally or by mutual choice, Tina's coverage was diminished. Taking away her coverage was in the nature of a forfeiture. *USF & G,* 351 F.2d at 687. While we need not decide if the definitional clause works a true forfeiture, it undoubtedly deprives Tina of coverage that was once hers, coverage for which a premium was computed and charged, and coverage which, in the absence of information to the contrary, she reasonably might have expected to continue so long as the premium on "her" car was paid. In our view, this termination of coverage is the type of unexpected result

that defeats the reasonable expectations of the insured. *Accord Wainscott, supra; cf. Matland v. United Services Automobile Association*, 174 N.J.Super. 499; 417 A.2d 46 (1980). This is especially true where, as here, the insurer charged and collected a premium for this precise risk—two cars and two drivers—and is not prejudiced by continued coverage after separation. *See USF & G*, 351 F.2d at 688–89 (quoting district court's findings); *United Farm Bureau v. Brantley*, 176 Ind.App. 178, 181, 375 N.E.2d 235, 237 (1978).

Third, assuming—as we think is probably the case in the absence of any contrary information in the record—that Shawn and Tina intended to obtain coextensive coverage, the provision extending greater coverage to Shawn than to Tina may well undercut the purpose of the transaction or even the dickered deal between the parties.

We are not implying that there is a *Darner* problem inherent in limiting extensions of coverage to those relatives of the named insured who actually reside with the insured.[8] The carrier cannot be expected—without extra compensation—to cover all of an insured's relatives, no matter who they are and where they are. Any contrary expectation would be objectively unreasonable. On the other hand, in the case before us, we presume Aetna contracted to insure a husband and wife. The boilerplate provisions are difficult to comprehend and take away the coverage originally granted one member. Thus, on the present record, we hold that the policy provisions limiting Tina's coverage merely because Shawn's name fortuitously was listed in the application are unenforceable under *Darner*. *See Wainscott, supra* (named insured reasonably could not have expected decreased coverage for his daughter as a result of his separation from his wife; both wife and daughter remained covered persons and insurance applied to daughter's death while riding in an uninsured vehicle).[9]

The possibility remains that these limitations were called to Shawn's *or* Tina's attention, that Shawn and not Tina was the named insured for a specific reason, such as the request of either, or that for some other reason the transaction was accomplished in accordance with the understandings or wishes of the parties. If Aetna can prove this, we will enforce the limitation of coverage against Tina.

We conclude, therefore, that the grant of summary judgment on the *Darner* issue was improper. Because of our disposition of the first issue, we need not reach the second issue at this time. However, we still must address whether the trial court erred in granting summary judgment in favor of Jean Gordinier and Western.

## II. MISREPRESENTATION

Tina contended that Jean and Western were guilty of the tort of misrepresentation because Jean, acting as Western's agent, had represented that Tina was fully covered under the policy and had assisted in renewing the policy without change, knowing that Tina and Shawn were living under separate roofs. We affirm the grant of summary judgment in favor of Jean and Western for the following reasons.

■ First, if the trial court finds that Aetna may not enforce the "resident of the same household" limitation, therefore finding that Tina is covered for uninsured motorist benefits, then, as a matter of law Jean and Western cannot be guilty of misrepresentation. *See John Hancock Mutual Life Insurance Co. v. McNeill*, 27 Ariz. App. 502, 508, 556 P.2d 803, 809 (1976). Second, a finding that either Jean or Western was an agent would render Aetna liable for coverage under general agency principles. *See, e.g., Darner, supra.* Third, if Jean was not an agent acting on behalf of Western, Western would not be

8. Whether a relative is a "resident of the same household" ordinarily remains a question of fact to be determined by a jury. *See Mid-Century Insurance Co. v. Duzykowski*, 131 Ariz. 428, 430, 641 P.2d 1272, 1274 (1982); 1 A. WIDISS, *supra* § 4.7, at 67–68.

9. This result also is supported by cases holding that an insurance company must notify a spouse of cancellation of his or her auto insurance by the named insured spouse, or coverage will be found to exist. *See Hansen, supra; Matland, supra.*

liable because Jean had no authority to bind it by her representation that Tina was fully covered. Nor, on this record, could Jean be held personally liable for misrepresentation even if she told Tina that she was fully covered because the statement was a gratuitous comment not made to further a pecuniary interest. *See* Restatement (Second) of Torts § 552 and comments c and d (1976). Accordingly, we affirm the grant of summary judgment in favor of Jean and Western.

## CONCLUSION

The opinion of the court of appeals is vacated and the judgment in favor of Aetna is reversed. The case is remanded for further proceedings in accordance with the principles set forth in this opinion.

GORDON, C.J., and CAMERON and MOELLER, JJ., concur.

HOLOHAN, Justice, dissenting.

I dissent.