NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JANET LAUFER, et al.,
*Plaintiffs/Appellants*,

*v.*

MICHAEL J. AUDITORE, et al.,
*Defendants/Appellees.*

JANET LAUFER, et al.,
*Plaintiffs/Appellants*,

*v.*

STARR INDEMNITY & LIABILITY COMPANY,
*Defendant/Appellee.*

No. 1 CA-CV 16-0288
1 CA-CV 16-0463
(Consolidated)
FILED 10-3-2017

Appeal from the Superior Court in Maricopa County
No. CV2014-094388
CV2016-001755
The Honorable Robert H. Oberbillig, Judge

**AFFIRMED**

COUNSEL

Schneider & Onofry, PC, Phoenix
By Charles D. Onofry, Luane Rosen
*Counsel for Plaintiffs/Appellants*

Manning & Kass, Ellrod, Ramirez, Trester, LLP, Phoenix
By Robert B. Zelms, Debora L. Verdier
*Counsel for Defendants/Appellees Auditore, et al.*

Sanders & Parks, PC, Phoenix
By Mark G. Worischeck, Shanks Leonhardt
*Counsel for Defendant/Appellee Starr Indemnity & Liability Co.*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

---

**J O H N S E N**, Judge:

**¶1**　　　　Janet Laufer and her family appeal the superior court's grant of summary judgment in favor of Starr Indemnity & Liability Company and Michael J. Auditore and his company, Auditore & Associates, LLC. For the reasons explained below, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**　　　　Jack Laufer worked for Sprayfoam Southwest, LLC and was a minority owner of the company. He died in a two-car accident on his way to work one day in his company truck. His family made a claim against the other driver, whose insurer paid them the $15,000 limits of the driver's liability policy.

**¶3**　　　　At the time of the accident, Sprayfoam was insured under a commercial auto insurance policy from Diamond State Insurance Company, which included uninsured and underinsured motorist coverages of $1 million. Sprayfoam also held a $5 million excess liability policy from Starr. Sprayfoam's insurance agent, Auditore, arranged both policies for the company.

¶4 The Laufers made claims on both the Diamond primary policy and the Starr excess policy. In response, Diamond declined to tender the $1 million policy limits, arguing Mr. Laufer would not have perished if he had been wearing a seatbelt, and so bore some fault. The Laufers ultimately accepted $850,000 under the auto policy. Starr, the excess carrier, denied the Laufers' claim, asserting that its policy expressly excluded underinsured motorist coverage.

¶5 The Laufers sued Starr and Auditore. They alleged Starr breached a contract and the covenant of good faith and fair dealing and, in a claim titled "Doctrine of Reasonable Expectation," the Laufers alleged they reasonably expected the Starr policy would cover underinsured motorist claims. They also alleged Auditore negligently failed to advise them and Sprayfoam concerning the excess policy.

¶6 After lengthy summary judgment proceedings, the superior court entered judgment for the defendants and awarded $125,000 in attorney's fees to Starr under Arizona Revised Statutes ("A.R.S.") section 12-341.01 (2017).[1] We have jurisdiction over the Laufers' timely appeal pursuant to A.R.S. § 12-2101(A)(1) (2017).

## DISCUSSION

### A. Summary Judgment in Favor of Starr.

¶7 We review *de novo* the grant of a motion for summary judgment. *Tierra Ranchos Homeowners Ass'n v. Kitchukov*, 216 Ariz. 195, 199, ¶ 15 (App. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a).

### 1. The binder as a contract.

¶8 On appeal, the Laufers no longer dispute that Starr's excess policy expressly excluded underinsured motorist coverage.[2] They argue,

---

[1] Absent material revision after the relevant date, we cite a statute's current version.

[2] Under a heading titled "Exclusions," the policy stated, "This insurance shall not apply to: . . . 'Ultimate Net Loss' arising out of or resulting from any first party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law."

however, that Starr was obligated to provide such coverage because the binder Starr issued to them through its broker represented that the excess policy would "follow [the] form" of the Diamond auto policy, which *did* include underinsured motorist coverage.

**¶9**  The binder was a four-page document directed to Auditore & Associates that began, "We are pleased to confirm that coverage has been bound . . . in accordance with terms, conditions, and limitations provided by the carrier for you and your insured to review."  The binder proceeded to specify three underlying insurance policies (general liability, automobile liability and worker's compensation) and their limits of liability, then identified the Starr policy as "Excess Liability Policy Form XS-100 (10/08) and Attachments."  Under the heading "Forms and Endorsements," the binder next stated:

> FOLLOWED POLICY: EXCEPT FOR THOSE ENDORSEMENTS LISTED BELOW IT IS INTENDED THAT THE POLICY OF THE CURRENT POLICY YEAR WILL FOLLOW THE TERMS AND CONDITIONS OF THE POLICY ISSUED BY THE FIRST UNDERLYING INSURANCE CARRIER AS INDICATED ABOVE.
>
> For a complete description of the coverage, please review the Policy's Terms, Restrictions & Limitations.  Please note that the Policy is amended by any endorsements listed below.

Directly below that legend, under a heading labeled "Attachments," were listed seven policy forms, including the excess policy Starr ultimately issued to Sprayfoam.  The binder identified it by number: "Excess Liability Policy Form XS 100 10 08."  Finally, the binder stated:

> TERMS AND CONDITIONS:
>
> This binder contains a broad outline of coverage and does not include all the terms, conditions and exclusions of the policy (or policies) that may be issued to you.  The policy (or policies) contain the full and complete agreement with regard to coverage.  Please review the policy (or policies) thoroughly with your broker upon receipt and notify us promptly in writing if you have any questions.  In the event of any inconsistency between the binder [and] the policy, the policy language shall control unless the parties agree to an amendment.

4

¶10 In general, a "follow-form" excess insurance policy follows the same "form" of an underlying primary policy, meaning the terms and conditions and exclusions of the primary policy. The excess policy Starr issued to Sprayfoam followed the form of the third-party liability component of the underlying automobile policy, but it did not follow the form of the underinsured/uninsured motorist component of that policy (as noted, although the underlying automobile policy included underinsured/uninsured motorist coverage, the excess policy excluded such coverages).

¶11 The Laufers argue that the binder's representation that the excess policy would follow the form of the underlying policies renders invalid or unenforceable the excess policy's express exclusion of underinsured motorist coverage. But the binder specifically warned that it did "not include all the terms, conditions and exclusions of the policy." Further, it stated that "[i]n the event of any inconsistency between the binder [and] the policy, the policy language shall control unless the parties agree to an amendment."

¶12 Moreover, the binder twice listed by number (XS 100 10 08) the form of the Starr excess policy and directed the reader to review the "Policy's Terms, Restrictions & Limitations" to see "a complete description of the coverage." Indeed, the binder's second reference to the number of the excess policy form was in a list of seven items directly following the binder's warning that "EXCEPT FOR THOSE ENDORSEMENTS LISTED BELOW IT IS INTENDED THAT THE POLICY . . . WILL FOLLOW THE TERMS AND CONDITIONS OF THE POLICY ISSUED BY THE FIRST UNDERLYING INSURANCE CARRIER . . . ."

¶13 The Laufers contend that the presence of the Starr excess policy form in the list of "endorsements" is of no moment because the specified policy form was "the actual body of the policy," not an "endorsement." While that is true, the point of the binder's warning was that the excess policy would follow form "except for" certain items, and, as relevant here, the specified excess policy form excepted underinsured motorist coverage, even though such coverage was included in the underlying primary policy. In this way, the binder's use of the term "endorsements" to identify exceptions or amendments to the general follow-form nature of the excess policy was not vague or inappropriate. *See* Black's Law Dictionary (8th ed. 1999) 569 (defining "endorsement" as "[a]n amendment to an insurance policy; a rider").

¶14        At a minimum, the express exclusion of underinsured motorist coverage in the Starr excess policy form created an "inconsistency" between the binder (as the Laufers construe the binder) and the policy. And the binder plainly provided that in the event of an inconsistency, "the policy language shall control." The same result follows from the principle that once an insurer issues a formal written policy, the policy's terms control over anything in the binder because the binder no longer has any effect. Under A.R.S. § 20-1120(B) (2017), as relevant here, an insurance binder is valid only until "issuance of the policy with respect to which it was given." *See Statewide Ins. Corp. v. Dewar*, 143 Ariz. 553, 556 (1984) ("A binder is simply a contract made in contemplation of the issuance of a later, formal agreement of insurance."). Sprayfoam's wholesale insurance broker sent the binder to Sprayfoam's agent, Auditore & Associates, on February 3, 2012, and forwarded the excess policy itself on May 9, 2012, roughly three months before the accident that killed Mr. Laufer.

**2.        Breach of covenant of good faith: "Reasonable expectations."**

¶15        Citing *Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266 (1987), and *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 391–94 (1984), the Laufers next argue the "doctrine of reasonable expectations" barred Starr from denying their claim for underinsured motorist coverage under the excess policy.

¶16        *Gordinier* held that "even unambiguous boilerplate terms in standardized insurance contracts" will not be enforced "in a *limited* variety of situations," including, as relevant here:

> 2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;

> 3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;

> 4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

154 Ariz. at 272–73 (citations omitted); *see* Restatement (Second) of Contracts § 211 (1981).

¶17        The basis for the Laufers' "reasonable expectations" claim is the binder, which they contend promised Sprayfoam that Starr's excess policy would follow the form of the underlying policies, including the Diamond automobile liability policy, which included underinsured motorist coverage.  The Laufers point to Auditore's testimony that he saw nothing in the binder that led him to believe the excess policy did not contain underinsured motorist coverage.  They further cite testimony by Rick Radobenko, Sprayfoam's CEO and majority owner, that he was surprised when he found out after the fact that the excess policy would not cover the accident.

¶18        As noted above, however, the binder did not promise that the Starr policy would follow the form of the underlying policies in all respects.  The binder expressly put Sprayfoam on notice that there were exceptions to "follow form," and told the company where to look to identify those exceptions.  It also specifically warned Sprayfoam that in the event of any inconsistencies between the binder and the formal policy, the policy would control.  Accordingly, even if the underinsured motorist exclusion was "unexpected" so far as Sprayfoam was concerned, the Laufers cannot show that the company lacked "full and adequate notice" of it.  Nor can the Laufers show that any act by Starr or its broker created a reasonable understanding that the excess policy would cover damages from underinsured motorists.  The Laufers point to no evidence that Starr or its broker made any representation to Sprayfoam concerning underinsured motorist coverage under the excess policy.  Although Radobenko testified he was surprised to learn after the accident that the Starr excess policy did not cover the Laufers' claim, he had not talked to Auditore or Starr's broker before the accident about excess coverage for an underinsured motorist claim.

¶19        Instead, the Laufers argue simply that they were promised a "follow-form" policy, which by their definition would have covered everything the underlying automobile liability policy covered, including damages caused by an underinsured or uninsured motorist.   But the fact that one provision of a policy generally extends coverage and another limits the circumstances under which that coverage will be provided "does not mean that the attempted limitation is contrary to the reasonable expectations of the insured."  *Millar v. State Farm Fire & Cas. Co.*, 167 Ariz. 93, 97 (App. 1990).  As *Darner* stated, "the reasonable expectation concept must be limited by something more than the fervent hope usually engendered by loss."  140 Ariz. at 390; *see also State Farm Fire & Cas. Co. v. Powers*, 163 Ariz. 213, 216 (App. 1989) (under the "reasonable expectation"

7

doctrine, "the expectations to be realized must be those that have been induced by the making of a promise").

¶20 For the doctrine of reasonable expectations to apply, the insured's "expectation of coverage must be objectively reasonable." *Millar*, 167 Ariz. at 97. In this context, the doctrine enforces the insured's expectations only if those expectations "have been induced by the making of a promise." *Darner*, 140 Ariz. at 390 (quoting 1 Corbin, *Contracts* § 1, at 2 (1963)). Here, the binder's representation that the excess policy would "follow form" was specifically limited by the terms of the excess policy itself. Under these circumstances, the insured had "no basis for believing that any particular loss would be covered without first reading the relevant policy provisions." *Millar*, 167 Ariz. at 97.

¶21 Application of the reasonable expectations doctrine also requires proof that the insurer had reason to believe that the insured would not have agreed to the provision if it had been aware of it. *First American Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 400, ¶ 31 (2008) ("Under this doctrine, a contract term is not enforced if one party has reason to believe that the other would not have assented to the contract if it had known of that term."); *State Farm Fire & Cas. Ins. Co. v. Grabowski*, 214 Ariz. 188, 194, ¶ 21 (App. 2007). On summary judgment, the Laufers offered no evidence to support the proposition that Sprayfoam would not have accepted the excess policy's exclusion of underinsured motorist coverage if it had been called to the company's attention. To this point, moreover, Radobenko, Sprayfoam's CEO, testified the company would not have paid for excess underinsured motorist coverage had it been offered.[3]

## B. Summary Judgment in Favor of Auditore.

¶22 The Laufers also argue the superior court erred by granting summary judgment to Auditore and his company. They contend that as Sprayfoam's insurance agent, Auditore and his company owed Mr. Laufer a duty, which the Auditore defendants breached by failing to inform Sprayfoam that the Starr excess policy did not contain underinsured motorist coverage. According to the Laufers, "If the excess policy was not

---

[3] According to the record, Starr does not offer excess underinsured motorist coverage in Arizona. Its excess policies include underinsured and uninsured motorist coverage only in states that require such coverage, and Arizona does not require it. None of the excess policies Sprayfoam purchased over the several years before Mr. Laufer's accident included underinsured or uninsured motorist coverages.

providing UM/UIM coverage, then Sprayfoam was entitled to know this so it could make an informed decision which binds all insureds including [Mr. Laufer]."

¶23 As the Laufers concede, however, Sprayfoam's decision about what insurance to purchase binds all those who would be insured under the company's policies, including Mr. Laufer. *See* A.R.S. § 20-259.01(B) (2017) ("selection of limits or rejection of coverage by a named insured or applicant . . . shall be valid for all insureds under the policy"). And, as the company officer in charge of making decisions concerning its insurance coverage, Radobenko testified that even if he had known that Starr's excess policy did not include underinsured motorist coverage, he would not have sought out a policy that did. Confronted with such testimony, the Laufers failed to offer evidence to establish a genuine issue of fact on this issue, let alone that any breach by the Auditore defendants caused them harm.

¶24 The Laufers rely on an affidavit in which Radobenko stated that he had believed that the Starr excess policy would cover the Laufers' loss and, more generally, that he "believed [the Starr policy] would cover . . . [Sprayfoam's] owners and employees for their injuries if they were hurt by other people who did not have insurance or did not have enough insurance." They also point to deposition testimony by Radobenko and Auditore that each man was surprised to learn after the fact that the excess policy did not cover the accident. But neither the affidavit nor the deposition testimony contradicts Radobenko's testimony that he would not have purchased excess underinsured motorist coverage if it had been offered.[4] Moreover, during his deposition, Radobenko testified that his

---

[4] Radobenko explained:

We're from that, you know, generation that we're going to live forever anyway. We think that all the insurance we buy is overrated and not necessary.

[Mr. Laufer] and Rob and I, we spend so much money on insurance that we have to do an enormous amount of business annually just to pay for insurance. And anything that would add to that cost, they would look at me like I'm an idiot. They would look at me and say, "Rick, you know, you're already spending a million dollars a year on insurance. We have to do $10 million a year just to pay for insurance, and you want to buy more?"

belief that the excess policy would cover the Laufers was not based on anything that Starr or Auditore had said or that he had read in the Starr policy. Instead, he said he knew Sprayfoam had an excess policy and knew that it might provide coverage.

¶25          Nevertheless, the Laufers argue that because Radobenko and Auditore were close personal friends, the jury could conclude that on behalf of Sprayfoam, and contrary to his deposition testimony, if Radobenko had known before the fact that the Starr policy did not include underinsured motorist coverage, he would have demanded another excess policy that included such coverage. The Laufers point to Radobenko's question to Auditore after learning after the accident that the excess policy excluded underinsured motorist coverage: "well, can we get it?" But that speculation flies in the face of Radobenko's testimony that he would not have purchased the coverage and the undisputed testimony that for as long as Auditore represented Sprayfoam, the excess policies the company purchased did not include underinsured motorist coverage.

¶26          The Laufers' contention that Radobenko testified falsely at his deposition in order to protect his friend Auditore from liability is insufficient to prevent summary judgment. *See Orme School v. Reeves*, 166 Ariz. 301, 311 (1990) ("[I]t would effectively abrogate the summary judgment rule to hold that the motion should be denied simply on the speculation that some slight doubt . . . might blossom into a real controversy in the midst of trial."); *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 292, ¶ 16 n.3 (App. 2010) ("A party opposing a motion for summary judgment is not entitled to proceed to trial on the mere hope that the jury will disbelieve uncontroverted testimony."); *GM Dev. Corp. v. Community Am. Mortg. Corp.*, 165 Ariz. 1, 5–6 (App. 1990) (after party moving for summary judgment submits facts sufficient to show existence of no genuine issue of material fact, party opposing motion must present "competent material" sufficient in response).

¶27          Accordingly, because the Laufers failed to offer sufficient evidence on summary judgment to create a genuine dispute of fact as to whether Auditore's alleged breach harmed Sprayfoam and/or the Laufers,

the superior court did not err in granting summary judgment in favor of the Auditore defendants.[5]

## C.    Attorney's Fees.

¶28      After prevailing on summary judgment, Starr filed a fee application pursuant to A.R.S. § 12-341.01 (2017), seeking $251,302.50 in fees. The superior court awarded Starr $125,000. We review the superior court's award of attorney's fees under A.R.S. § 12-341.01 for an abuse of discretion, and will uphold the court's award if it has "any reasonable basis." *State Farm Mut. Auto. Ins. Co. v. Arrington*, 192 Ariz. 255, 261, ¶ 27 (App. 1998).

¶29      The Laufers do not contest the applicability of the fees statute, but say only that Ms. Laufer is a widow and argue that the legal issues their claims present are not simple. We decline to upset the superior court's exercise of discretion in granting the award.

---

[5]    The superior court entered summary judgment for the Auditore defendants on another ground, but we may affirm summary judgment on any ground raised in the superior court. *See ABCDW LLC v. Banning*, 241 Ariz. 427, 433, ¶ 16 (App. 2016).

**CONCLUSION**

¶**30** For the foregoing reasons, we affirm the judgment of the superior court.[6] We grant Starr its costs, contingent on compliance with Arizona Rule of Civil Appellate Procedure 21, but deny its request for attorney's fees on appeal.



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[6] Both in the superior court and on appeal, the parties disputed whether the Starr excess policy could be implicated when the underlying auto insurer had not paid its policy limits and whether the Auditore defendants owed a duty of care to Mr. Laufer. Because we have affirmed the superior court's judgment on other grounds, we do not address those issues.