738 P.2d 1140

**John A. VAN SICKLE,
Plaintiff/Appellant,**

v.

**FARMER'S INSURANCE COMPANY
OF ARIZONA, an Arizona
corporation, Defendant/Appellee.**

**No. 2 CA–CV 5958.**

Court of Appeals of Arizona,
Division 2, Department A.

March 17, 1987.

Review Denied June 16, 1987.

Beus, Gilbert, Wake & Morrill by J. Tyrrell Taber, Caroline Barron and Paula S. Bickett, Phoenix, for plaintiff/appellant.

Crampton, Woods, Broening & Oberg by Jim Broening and Jan Cleator, Phoenix, for defendant/appellee.

OPINION

HOWARD, Presiding Judge.

This is an appeal from the trial court's order granting a judgment notwithstanding the verdict and conditionally granting a new trial.[1] The plaintiff John A. Van Sickle suffered serious injuries as a result of an accident while riding his all-terrain vehicle (ATC). The issue before the jury was whether Van Sickle had a policy of insurance with the defendant Farmers Insurance Company of Arizona (Farmers) which covered his accident. The jury determined that Farmers covered him under an insurance contract for $100,000 medical payments and $100,000 liability coverage.

We review the evidence to determine whether it was of such a character that reasonable minds could differ as to the inference to be drawn from the facts. *Adroit Supply Co. v. Electric Mut. Liability Ins. Co.*, 112 Ariz. 385, 542 P.2d 810 (1975).

Van Sickle is a building contractor. In 1980 his business owned approximately 20 vehicles. He and his wife had an automobile and he had travel trailers and some "dirt bikes" which he kept at his place of business.

Van Sickle became acquainted with Glen Wood, district manager for Farmers, who lived in Van Sickle's condominium complex. Wood told him that he would like to have his insurance business and wanted it written through one of his agents, Keith Tait. On April 8, 1980, Wood and Tait met Van Sickle at Van Sickle's place of business. They checked all the buildings and saw all the equipment and vehicles, including some dirt bikes. Van Sickle may have owned an ATC at the time and if he did it would have been with the dirt bikes. Wood and Tait testified that they never saw an ATC on the premises and Van Sickle testified that

---

1.  Under Rule 50(c)(1), Rules of Civil Procedure, 16 A.R.S., the trial court may, in addition to entering a judgment notwithstanding the verdict, grant a new trial which will take place if the judgment is reversed on appeal.

he could not dispute their testimony. When Tait saw the dirt bikes, he said, "We provide full coverage on unlicensed vehicles." Van Sickle expressed no interest, according to Tait, and said that the vehicles were only used to ride in the desert. Van Sickle testified that he believed Tait was assuring him that insurance would be provided for the dirt bikes and the only reason he opened the door to the building in which the bikes were located was to show them to Tait since there was nothing else in the building. Through all the negotiations and the relationship with Farmers that took place afterwards, Tait's initial statement about coverage was the only time these vehicles were ever mentioned by anyone.

Van Sickle wanted a commercial policy that would cover his business operations. The dirt bikes were not part of the business. The policy that was issued by Farmers was a commercial policy covering the business premises and property related to the business. The policy was effective from May 1980 to May 1981, and specifically set forth a list of the vehicles covered. Van Sickle knew that none of the dirt bikes or any ATC's were listed in the policy. Some personal assets, Van Sickle's Lincoln Continental and his travel trailer, were listed on his business policy. Tait testified that Van Sickle told him that they were used in connection with his business, but Van Sickle denies this. Within six to nine months after Tait's initial visit, Tait had virtually all of Van Sickle's insurance business, both personal and commercial.

Tait had offered Van Sickle auto/medical coverage for his commercial fleet of vehicles in his April 1980 quote but Van Sickle felt there was no need for it since his employees were covered under worker's compensation. Tait also recommended that Van Sickle buy an "umbrella" policy but Van Sickle declined to purchase that coverage. Furthermore, Van Sickle indicated to Tait that he did not want hospital insurance or life insurance.

In May 1981, Van Sickle was informed by Farmers that his commercial policy needed to be renewed and that his rate would double. This caused Van Sickle to change his commercial policy to another insurance company. However, Van Sickle asked Tait to continue insuring his "personal assets." Tait testified that in May 1981, Van Sickle specifically asked him to cover only his Lincoln automobile and travel trailer on an automobile policy. Van Sickle told Tait that he wanted the same medical and liability coverage that he had in the past, namely, $100,000 per person/$300,000 per occurrence.

In May 1981, the commercial policy was cancelled and the Lincoln Continental and travel trailer were taken off the commercial policy and placed on a separate personal policy with Farmers along with Mrs. Van Sickle's Toyota. As previously stated, nothing was ever said about coverage of any ATCs. If Farmers had written a policy for off-road vehicles, dirt bikes or ATCs, it would have been a separate recreational policy which had a $1,000 limit on medical payment coverage. The application for automobile coverage, which was signed by Van Sickle, listed two vehicles, the Lincoln and the Toyota. There was also an application for travel trailer insurance which became part of the automobile policy as an endorsement. The limits of liability on this policy were $100,000/$300,000. This was the only policy in existence on April 3, 1982, when Van Sickle was driving one of his ATCs, which he had purchased six weeks prior to the accident. The policy contained an exclusion which read, "This coverage does not apply for bodily injury to any person sustained while occupying a motorized vehicle with less than four wheels." Van Sickle's ATC had three wheels.

Van Sickle's lawyer wrote the following letter to Tait on April 19, 1982:

" * * *

As you know, John Van Sickle is a good friend of mine and he has asked that I contact you to see if you could help him with his insurance. As you know, he had a serious accident and has substantial medical bills accruing at John C. Lincoln Hospital.

Could you please provide me an explanation of what coverage he has and the

insurance you handle for him. Thank you very much.

* * * "

In response Tait wrote the lawyers:

" * * *

In answering your letter on April 19, 1982 regarding John VanSickle; [sic] He has his automobile Insurance through me. His policy states that he has coverage in the amount of $100,00 [sic] in Medical Coverage for Auto Medical."

Since the ATC was not covered by the policy of insurance, Farmers denied coverage and refused to pay for Van Sickle's medical bills. This suit followed.

Van Sickle's theory in the trial court was that he had a reasonable expectation that his ATC was covered under his policy with Farmers. He contends that reasonable minds could conclude that his expectation was justified and that the trial court erred in entering a judgment notwithstanding the verdict. We do not agree.

This case is governed by *Darner Motor Sales v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984). *Darner* was an appeal from the granting of summary judgment in favor of the insurance company. Darner purchased a "U–Drive policy" from Universal through its agent, Doxsee. The policy insured Darner and the lessees of its cars for automobile liability risk. Darner was covered in limits of $100,000 for any one injury and $300,000 for all injuries arising out of any one accident ($100/300). The lessees were covered in limits of 15/30. The rest of Darner Motors' business risk continued to be insured under a "dealership package policy" issued by the Travelers Company.

In April 1975, a renewal date of the Travelers' policy, Universal picked up the entire insurance "package" for Darner Motors' various business activities. This "package" consisted of a Universal "Unicover" policy which included coverage for garage keepers liability, property coverage, crime coverage, customer coverage, and plate glass insurance. The parties described the policy as an "umbrella" policy. In addition to the umbrella policy, Universal also renewed the U–Drive policy which provided coverage to the lessees of Darner Motors.

According to Darner, he told Doxsee that renewal of the lessee coverage was to be in the same limits as applied to Darner Motors in the original U–Drive policy, to-wit, 100/300. When the new U–Drive policy arrived, Darner examined it and noticed that the limits of the coverage for the lessees were 15/30. Darner called Doxsee. He was concerned because his rental contract contained a representation of greater coverage (100/300) and because he felt it would be better for his business operation if his lessees had the higher coverage. Darner told Doxsee that the liability limits of the U–Drive policy did not conform to their prior agreement, and asked Doxsee to come to Darner Motors and discuss the matter with him. Doxsee did so and Doxsee told Darner not to worry about the limits because, although the U–Drive policy provided only 15/30 coverage, the all-risk clause of the umbrella policy would provide additional coverage to limits of 100/300.

Subsequently, Darner Motors rented a car to Crawford. The form used for the rental agreement contained a representation of coverage in the amount of 100/300. While driving the vehicle under this contract, Crawford negligently injured a pedestrian and caused severe injuries. The pedestrian sued Crawford, who looked to Universal for coverage. Universal claimed the lessee's coverage on the U–Drive policy was limited to 15/30. Crawford then sued Darner Motors under the rental agreement warranty that coverage was provided in the limits of 100/300. Darner Motors called upon Universal to provide additional coverage under the umbrella policy. The umbrella policy did contain the higher limits, but Universal claimed that lessees were not parties "insured" as that term was defined in the all-risk policy. Had Darner read the umbrella policy he would have seen that lessees were not parties insured under the all-risk policy.

Among the theories Darner Motors advanced in its claim that Universal was obligated to indemnify against loss was that of

estoppel. The court agreed that that theory was available.

In arriving at its conclusion, the court in *Darner* noted that Arizona had previously recognized the doctrine of "reasonable expectations" and made it quite clear that the "reasonable expectation" concept is limited by something more than the fervent hope that is usually engendered by loss and that the expectations to be realized must be those that have been induced by the *making of a promise.* 140 Ariz. at 390, 682 P.2d at 395. The court then held that Restatement (Second) of Contracts § 211, applies to insurance contracts. *Id.* at 391, 682 P.2d at 396. This section of the Restatement concerns the treatment of standardized agreements. Subsection (3) of the Restatement, the reasonable expectation rule as applied to standardized agreements, states:

> "Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement."

Comment *f* of § 211 explains:

> " * * *
>
> Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction...."

In applying the rule to the facts in *Darner,* the court held that an insured can raise the issue of estoppel to establish coverage contrary to the limitations in the boiler-plate policy language when the insurer's agent has represented coverage greater than that found in the printed policy. The court also held that equitable estoppel is available to prevent enforcement of those boiler-plate terms of an insurance contract which are more limited than the coverage agreed upon by the parties.

The facts here are in no way comparable to those in *Darner.* There was no agreement that the ATC would be covered under the policy which was in existence at the time the accident occurred. The unlicensed vehicles were only mentioned once when Tait and Wood initially looked through the premises, prior to any type of negotiations. Tait's statement that Farmers provided coverage of unlicensed vehicles cannot be metamorphized into a promise to insure Van Sickle's ATC under the policy which was in effect. Nor does the exclusion of three-wheel vehicles from coverage under the automobile liability policy give effect to boiler-plate terms which are contrary to the purpose of the transaction as known to the contracting parties. The trial court did not err in granting the judgment notwithstanding the verdict.

Affirmed.

HATHAWAY, C.J., and FERNANDEZ, J., concur.