773 P.2d 1012

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Plaintiff–Appellee,**

v.

**Sylvester J. DIMMER and Germaine D. Dimmer, husband and wife, Defendants–Appellants.**

**No. 1 CA–CIV 9794.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 29, 1988.

Reconsideration Denied Jan. 27, 1989.

Review Denied June 13, 1989.*

---

* Moeller, J., of the Supreme Court, voted to grant review.

Ridenour, Swenson, Cleere & Evans by James W. Evans, David L. Knapper, Lloyd J. Andrews, Phoenix, for plaintiff-appellee.

Van O'Steen and Partners by Stephen I. Leshner, W. Marc Ducker, Phoenix, for defendants-appellants.

OPINION

SHELLEY, Presiding Judge.

Appellants Sylvester J. Dimmer and Germaine D. Dimmer appeal from summary judgment entered for appellee State Farm Mutual Automobile Insurance Company in State Farm's action for declaratory relief and from the denial of appellants' cross-motion for summary judgment. The trial court held that the Dimmers' automobile liability policy, on which the liability limits were $50,000 per person and $100,000 per occurrence, provided coverage of only $15,000 as applied to Germaine Dimmer's claim against Sylvester Dimmer for injuries she sustained while riding as a passenger in a covered automobile.[1]

The appeal presents the following issues: (1) whether the "household exclusion" clause in State Farm's automobile liability policy is void on public policy grounds; and (2) whether the doctrine of reasonable expectations precludes enforcement of State

---

1. State Farm's complaint also sought declaratory relief regarding the underinsured motorist coverage in a separate policy insuring the Dim-

mers' 1972 Jaguar. The Dimmers and State Farm settled that issue, and it is not before the court in this appeal.

Farm's "household exclusion" clause in this case. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

### Facts and Procedural History

Sylvester Dimmer purchased the policy that is the subject of this litigation in or about 1972 from Ed Ricestead of Glendale. According to Dimmer, Ricestead explained to him the coverages he should have. Dimmer testified:

> All my policies covered what I thought was maximum coverages and when I was working real estate I carried a little higher liability because it was required by our broker and actually I thought I had a higher liability but because of the conservative nature of this I probably in talking with Ed that's why I came down to the 50 on liability.

Dimmer received a copy of the policy when he bought it, and thereafter spoke to Ricestead only about coverages Ricestead recommended for him. Dimmer did not ask Ricestead or anyone else from State Farm to explain to him when policy provisions would apply or not apply. Other than in general terms, Dimmer stated Ricestead never detailed the facts and situations in which the policy coverages would and would not apply. He also did not suggest that Dimmer read the policy or addenda he received from State Farm. Dimmer believed he probably read the addenda that were sent to him.

Eventually Dimmer acquired a 1978 Ford LTD. During the period from May 29, 1982 through November 29, 1982, Dimmer's State Farm policy provided bodily injury liability coverage on the Ford LTD in the amount of $50,000 for "each person" and $100,000 for "each accident." The policy's declarations page listed Sylvester J. Dimmer as the "named insured." The declarations page also stated:

> YOUR POLICY CONSISTS OF THIS PAGE, ANY ENDORSEMENTS, AND THE POLICY BOOKLET, FORM 9803.4 PLEASE KEEP TOGETHER.

Page 2 of the policy booklet contained the following definitions:

*Bodily injury*—means bodily injury to a *person* and sickness, disease or death which results from it.

. . . .

*Insured*—means the *person, persons* or organization defined as *insureds* in the specific coverage.

. . . .

*Person*—means a human being.

. . . .

*You* or *your*—means the named insured or named insureds shown on the declarations page.

Section 1 of the policy booklet, which discussed liability coverage, began in the middle of page 4 and ended on page 6. On page 4 it provided in part:

We will:

1. pay damages which an *insured* becomes legally liable to pay because of:

a. *bodily injury* to others, and

b. damage to or destruction of property including loss of its use, caused by accident resulting from the ownership, maintenance or use of *your car;* and

2. defend any suit against an *insured* for such damages with attorneys hired and paid by us. We will not defend any suit after we have paid the applicable limit of our liability for the accident which is the basis of the lawsuit.

On pages 5 and 6 it provided in part:

*Limits of Liability*

The amount of bodily injury liability coverage is shown on the declarations page under "Limits of Liability—Coverage A—Bodily Injury, Each Person, Each Accident." Under "Each Person" is the amount of coverage for all damages due to *bodily injury* to one *person*.

. . . .

We will pay damages for which an *insured* is legally liable up to these amounts.

. . . .

### When Coverage A Does Not Apply

In addition to the limitations of coverage in "Who Is an Insured" and "Trailer Coverage":

THERE IS NO COVERAGE:

....

2. FOR ANY *BODILY INJURY* TO:

....

d. ANY:

(1) *INSURED* OTHER THAN *YOU;* OR

(2) FAMILY MEMBER OF AN *IN-SURED* RESIDING IN THE SAME HOUSEHOLD AS THE *INSURED.* TO THE EXTENT THE LIMITS OF LIABILITY OF THIS POLICY EX-CEED THE LIMITS OF LIABILITY REQUIRED BY LAW.

Dimmer's affidavit in support of the Dimmers' motion for summary judgment stated in pertinent part:

4. My intention and understanding of the coverage provided by these policies was that my wife would be covered to the same extent as any other person would be for any injuries that they would have been covered for under these poli-cies, including uninsured motorists and underinsured motorists coverages.

5. Neither State Farm Mutual Auto-mobile Insurance Company nor any of its agents ever suggested to me that any exclusion existed on the policy that would preclude my wife from having the same coverage as any other person would as to any accident she or they were involved in. Nor was I offered any alternate policy option for securing such coverage.

6. If I had known that there was any question of my wife not being insured to the same extent as any other person, I certainly would have sought a different insurance policy.

....

10. Since the time of the accident, I have read my policy over and found no reason to think we would not be covered for $50,000 on the policy, or on the un-derinsurance.

On November 19, 1982, Mrs. Dimmer was injured while riding as a passenger in the 1978 Ford LTD, which was being driv-en by Dimmer. Mrs. Dimmer thereafter filed suit against Dimmer in Maricopa County Superior Court. On September 24, 1986, State Farm filed its amended com-plaint in this action, seeking a declaration that its policy on the Ford LTD provided Dimmer with liability coverage in the amount of $15,000 only. The Dimmers' answer alleged that Mrs. Dimmer sus-tained damages exceeding $65,000 in the accident, and that she was entitled to the $50,000 liability coverage provided by the State Farm policy on the Ford LTD. On cross motions for summary judgment, the trial court ruled for State Farm. The trial court's minute entry of June 30, 1987 stat-ed in pertinent part:

As to the issue of whether the Ford LTD policy provided for coverage above the $15,000 statutory minimum, the court concludes that it does not. The clear language of the policy precludes cover-age for bodily injury to a family member of an insured residing in the same house-hold as the insured except as required by law. Under the holding in *Arceneaux v. State Farm Mutual Automobile Insur-ance Company,* 113 Ariz. 216, 550 P.2d 87 (1976), the parties were free to include a household exclusion so long as it did not preclude recovery for the statutory minimum. This court does not read *Spain v. Valley Ford [sic] Insurance Company,* 152 Ariz. 189, 731 P.2d 84 (Ariz.1986) as overruling *Arceneaux* on this issue. *Spain* merely reconfirms that the carrier cannot circumvent public policy as reflected in the legislative in-tent by using offset provisions. Here, defendants have shown no public policy requiring that household members be provided with policy limit coverage. Ad-ditionally, the court concludes that the policy is not ambiguous and the defen-dants' affidavits do not present a show-ing of reasonable expectations within *Darner Motor Sales v. Universal Un-derwriters Insurance Company,* 140 Ariz. 383, 682 P.2d 388 (1984).

The trial court entered formal judgment in accordance with its ruling, and this timely appeal followed.

*Does the Household Exclusion Violate Public Policy?*

■ The Dimmers acknowledge that in *Arceneaux v. State Farm Mutual Auto.*

*Ins. Co.*, 113 Ariz. 216, 550 P.2d 87 (1976), our supreme court held that a household exclusion similar to the one under consideration here was void to the extent it would exclude the $15,000 minimum coverage required by the Uniform Motor Vehicle Safety Responsibility Act, but was enforceable to the extent the policy's liability limits exceeded $15,000. The court stated:

> In matters not mandated by law (or the public policy of this state) the parties should be permitted to make their own contractual arrangements.

*Id.* at 217, 550 P.2d at 88. The Dimmers argue, however, that in view of later appellate decisions in Arizona and other jurisdictions, *Arceneaux* is no longer viable.

The Dimmers note that since 1980 a number of courts in other jurisdictions have voided household exclusions and held, either explicitly or implicitly, that in situations in which such exclusions would apply, the insurer must provide coverage up to the policy limits, not merely the minimum limits required by statute. The authorities cited by the Dimmers, however, indicate that is a minority position in this country. *Meyer v. State Farm Mutual Auto. Ins. Co.*, 689 P.2d 585, 592–94, (Colo.1984) [2]; *Family Exclusion—Validity*, 52 A.L.R. 4th 18 (1987). We also note that of the cases the Dimmers cite in support of the minority position, three do not specifically address the question of whether the household exclusion was sustainable to the extent the policy limits exceeded the statutory minimum limits, *Transamerica Ins. Co. v. Royle*, 202 Mont. 173, 656 P.2d 820 (1983); *Estep v. State Farm Mutual Auto. Ins. Co.*, 103 N.M. 105, 703 P.2d 882 (1985), *Hughes v. State Farm Mutual Auto. Ins. Co.*, 236 N.W.2d 870 (N.D.1975), and one actually aligns itself with the majority position. *State Farm Mutual Auto. Ins. Co. v. Nationwide Mutual Ins. Co.*, 307 Md. 631, 516 A.2d 586 (1986). In any event, the question of whether to recede from a decision of the Arizona Supreme Court is for that court to make. *See Rodriguez v. Salt River Valley Water Users Association*, 19 Ariz.App. 223, 506 P.2d 263 (App.1973).

For the same reason, we must reject the Dimmers' contention that *State Farm Mutual Auto. Ins. Co. v. Janssen*, 154 Ariz. 386, 742 P.2d 1372 (App.1987) and *Spain v. Valley Forge Ins. Co.*, 152 Ariz. 189, 731 P.2d 84 (1986) require the abandonment of *Arceneaux*. Both *Janssen* and *Spain* are exclusively based on the distinct statutory provisions governing the availability of uninsured motorist insurance. Neither can reasonably be viewed as affecting the holding in *Arceneaux*.

The trial court correctly rejected the Dimmers' contention that the household exclusion violates public policy.

## Are the Dimmers Entitled to $50,000 Liability Coverage under the Doctrine of Reasonable Expectations?

The Dimmers next argue that the trial court erred in holding that their situation was not within the doctrine of reasonable expectations adopted by *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388 (1984) and its progeny. We agree.

In *Darner*, the supreme court adopted *Restatement (Second) of Contracts* § 211 (1979) to govern the enforcement of boilerplate terms in standardized adhesion contracts like the State Farm policy before us in this case. Section 211 provides:

Standardized Agreements

(1) Except as stated in subsection (3) where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.

(2) Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standardized terms of the writing.

---

**2.** Though the *Meyer* court adopted the minority position, it acknowledged that the arguments supporting decisions like that in *Arceneaux* were "equally compelling...." *Meyer*, 689 P.2d at 592.

(3) Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.

*See Darner*, 140 Ariz. at 391, 682 P.2d at 396. Concerning the effect of § 211 in general, the *Darner* court explained:

The rule adopted today recognizes reality and the needs of commerce; it allows businesses that use such forms to write their own contract. It charges the customer with knowledge that the contract being "purchased" is or contains a form applied to a vast number of transactions and includes terms which are unknown (or even unknowable); it binds the customer to such terms. However, the rules stop short of granting the drafter of the contract license to accomplish any result. It holds the drafter to good faith and terms which are conscionable; it requires drafting of provisions which can be understood if the customer does attempt to check on his rights; it does not give effect to boilerplate terms which are contrary to either the expressed agreement or the purpose of the transaction as known to the contracting parties.

*Id.* at 393–94, 682 P.2d at 398–99.

The court adopted comment (f) to § 211 as a guide to applying subsection (3) of § 211 in interpreting provisions of insurance policies:

Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. . . . [An insured] who adheres to the [insurer's] standard terms does not assent to a term if the [insurer] has reason to believe that the [insured] would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that

it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman.

140 Ariz. at 391–92, 682 P.2d at 396–97. In *Darner*, the court held that the record revealed a triable factual dispute concerning whether the insurer's agent told the insured that the policy provided the insured's rental customers with $100,000/$300,000 liability coverage, though the policy language itself provided only limits of $15,000/$30,000. The court therefore reversed summary judgment for the insurer and remanded for further proceedings on the insured's claims for equitable estoppel, reformation, negligence and misrepresentation.

Contrary to State Farm's argument, application of the principles announced in *Darner* is not limited to situations in which the insured's expectations of coverage were induced by the insurer's promises or misrepresentations. In *State Farm Mutual Auto. Ins. Co. v. Bogart*, 149 Ariz. 145, 151–52, 717 P.2d 449, 455–56 (1986), the court stated:

*Darner* does not stand for the narrow proposition that § 211 is simply a remedy for misrepresentation. Remedies for misrepresentation already existed in the law. *Darner* is, rather, a methodology for interpretation of boilerplate provisions in transactions in which the seller of the product or service does business in such a way that the fact finder can conclude it is improbable that the customer will read or understand the boilerplate. *See* Restatement (Second) of Contracts, § 211, comment b.

Unlike *Darner*, *Bogart* did not deal with alleged promises or misrepresentations made by the insurer or its agent. In *Bogart* the insured purchased "owned" and "non-owned" automobile liability insurance coverage with limits of $100,000/$300,000. The declarations page of the policy, which

contained the "dickered deal," reflected non-owned coverage with those limits. Buried in the interior of the policy boilerplate, however, was a provision which, when read together with other provisions scattered throughout the policy, had the effect of entirely excluding the policy's coverage of any rented automobile covered by any other liability policy. The court held:

> Given the clear indication of coverage in the declaration page of the policy, the lack of any exclusion in the exclusion portion of the policy, the non-standard nature of this other insurance clause, its location under "policy conditions" and the necessity to consult the definition clause in order to determine applicability, we cannot say that the trial court erred in concluding that the exclusion relied on by State Farm was ambiguous when the policy is considered as a whole, as it must be. *Sparks v. Republic National Life Insurance Company*, 132 Ariz. 529, 536, 647 P.2d 1127, 1134 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1983). This type of ambiguity is one which will justify non-enforcement under the *Darner* rule. *See Darner*, 140 Ariz. at 390–91, 682 P.2d at 396–97; Restatement (Second) of Contracts § 211; 3 A. CORBIN, CORBIN ON CONTRACTS § 582 (1960).
>
> For similar reasons, we believe it quite clear that the clause in question also significantly modifies the "dickered deal" and could even be found unconscionable. The "dickered deal" was to buy $100,-000/$300,000 in owned and non-owned auto coverage. Most informed policyholders would be shocked to discover that the substantial protection which they had purchased was reduced to the $15,000 minimum statutory coverage whenever they drove a rented car. Such an eventuality is certainly one that should be called to the attention of the insured.

149 Ariz. at 153, 717 P.2d at 457.

The supreme court most recently applied the *Darner* principles in *Gordinier v. Aetna Casualty & Surety Company*, 154 Ariz. 266, 742 P.2d 277 (1987). In that case, the insured husband purchased an automobile insurance policy for the insured couple's only car. The policy listed the husband as the named insured and both husband and wife as drivers for the car. Thereafter, the husband and wife separated, and the wife received the couple's car. The original policy remained in effect, and the husband continued to pay the policy premiums. The insurer was never informed that the husband and wife had separated, and neither the husband nor the wife were ever informed that their separation would jeopardize the wife's insurance coverage.

Sixteen months after the separation, the wife sustained injuries while she rode as a passenger on an uninsured motorcycle owned and driven by a friend. She filed a claim for uninsured motorist benefits on the automobile policy, but the insurer rejected it on the ground that she was not a named insured under the policy, was not in a covered automobile, and was not residing in the same household as her husband, the named insured. The trial court granted summary judgment for the insurer in the wife's action for damages, and the court of appeals affirmed, holding that the wife was not entitled to coverage based on the "reasonable expectations" doctrine of *Darner* because the phrase "resident of the same household" in the policy boilerplate was unambiguous. *Gordinier*, 154 Ariz. at 269, 742 P.2d at 280.

The supreme court granted review. In the course of its analysis, the court presented the following summary of the doctrine of reasonable expectations:

> As a synthesis of the cases and authorities demonstrates, Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a *limited* variety of situations:
>
> 1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured (*see Bogart, supra; Wainscott v. Ossenkop,*

633 P.2d 237 (Alaska 1981) (application of "resident of same household" definition, while not technically ambiguous, defeats reasonable expectations of spouse));

2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage (*see Zuckerman [v. Transamerica Insurance Co.,* 133 Ariz. 139, 650 P.2d 441 (1982)], *supra;*

3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured (*see Sparks [v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982)], *supra);*

4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy (*see Darner, supra).*

*Gordinier,* 154 Ariz. at 272–73, 742 P.2d at 283–84. The supreme court reversed and remanded, holding that the exclusion in the Gordiniers' policy was unenforceable for three reasons: (1) although the provisions in question were unambiguous by themselves, the average consumer attempting to check on his or her rights could not readily understand them because of their location in the policy; (2) the provision in question could be deemed unexpected or one that emasculated apparent coverage; and (3) the provision may well have undercut the purpose of the transaction or even the dickered deal between the insureds and the insurer. The court stated:

> The boilerplate provisions are difficult to comprehend and take away the coverage originally granted one member. Thus, on the present record, we hold that the policy provisions limiting Tina's coverage merely because Shawn's name fortuitously was listed in the application are unenforceable under *Darner.*

*Id.* at 274, 742 P.2d at 285. The court remanded for trial on the question of whether for some reason not shown by the record the transaction was in fact accomplished in accordance with the understandings or wishes of both the insureds and the insurer.

■ In our opinion, the household exclusion in the instant case is unenforceable against the Dimmers under the *Darner* principles as applied in *Bogart* and *Gordinier.* The declarations page succinctly informed the Dimmers that they had bodily injury coverage of $50,000 for "each person" and $100,000 for "each accident" for their Ford LTD. The declarations page contained no specific qualification of that statement, and page 2 of the printed policy defined "person" as "a human being." A reasonably intelligent person in the Dimmers' position would have concluded from those provisions that the $50,000–per–person liability coverage of the policy would apply in that amount no matter who was injured by an insured's negligence, as long as that person was "a human being." That, of course, would have included appellant Germaine Dimmer.

The provision which would have "unambiguously" contradicted that conclusion was located on page 6 of the 15–page printed policy, among clauses that concerned use of a covered vehicle to carry people for a charge, use of a covered automobile by a repair or service business, use of a covered automobile by a fellow employee or an employee of an insured, damages for which the United States might be liable, workers' compensation liability, and insureds' contractual liability. As we noted previously, it provided:

> THERE IS NO COVERAGE:
>
> . . . .
>
> 2. FOR ANY *BODILY INJURY* TO:
>
> . . . .
>
> d. ANY:
>
> (1) *INSURED,* OTHER THAN *YOU;* OR
>
> (2) FAMILY MEMBER OF AN *INSURED* RESIDING IN THE SAME HOUSEHOLD AS THE *INSURED.* TO THE EXTENT THE LIMITS OF LIABILITY OF THIS POLICY EXCEED THE LIMITS OF LIABILITY REQUIRED BY LAW.

This language might communicate clearly to a person trained in the law or the insurance business that Germaine Dimmer's claim against Sylvester Dimmer would be covered only to the extent of the $15,000/$30,000 limits required by A.R.S. § 28–1170(B)(2)(a). In a *Darner* analysis, however, it is immaterial that the language in question would be unambiguous to a technically trained person. *See Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). What counts under *Gordinier* is what "the reasonably intelligent consumer who might check on his or her rights" would understand. *Gordinier*, 154 Ariz. at 272, 742 P.2d at 283. In our opinion it is beyond dispute that a reasonably intelligent consumer without legal training or experience in the insurance field simply would not know that "the limits of liability required by law" are only $15,000/$30,000, or that under the household exclusion the named insured's spouse could look to that amount of coverage, and no more, for a negligence claim against the named insured.

Unlike the situation in *Green v. Mid–America Preferred Ins. Co.*, 156 Ariz. 265, 751 P.2d 581 (App.1987), *review denied* April 5, 1988, the Dimmers would not have needed to refer to the printed policy to understand the meaning of the declarations page in this case. As to the question of how much per-person bodily injury liability coverage the policy provides, the declarations page makes it quite plain that it is $50,000. Instead, this case more closely resembles *Gordinier*, in which the boiler-plate exclusion in issue drastically reduced coverage provided on the face of the declarations page. *See Green*, 156 Ariz. at 270, 751 P.2d at 586; *Gordinier*, 154 Ariz. at 273–74, 742 P.2d at 284–85.[3] Under the circumstances of this case, the "objective, reasonable expectations of the average insured" in the Dimmers' position would

have included liability protection in the amount of $50,000 for any person—including Germaine Dimmer—with an automobile negligence claim against Sylvester Dimmer. Pursuant to *Gordinier* and *Bogart*, we accordingly so interpret the State Farm policy.

The judgment must therefore be reversed with directions to enter judgment for the Dimmers.

State Farm's reliance on *Arizona Property and Casualty Ins. Guaranty Fund v. Dailey*, 156 Ariz. 257, 751 P.2d 573 (App. 1987), *review denied* March 30, 1988, is misplaced. In that case the insured based his *Darner* claim exclusively on the theory that the insurer had led him to believe that the kind of accident that occurred would be covered by his policy. The court found there was no evidence to support that theory, and it was in that context that it stated:

In order for *Darner* to apply, the appellees would have to show that the insurance company did something or said something which would reasonably lead Vance to believe that his insurance covered the plane when it was used by a non-employee instructed to train him and his employees.

156 Ariz. at 260, 751 P.2d at 576. Contrary to the inference State Farm would have us draw, the court in *Dailey* certainly did not hold, and indeed could not hold consistently with *Gordinier* and *Bogart*, that no *Darner* claim can be made absent proof of promises or misrepresentations by an insurance agent. *Van Sickle v. Farmer's Ins. Co.* 153 Ariz. 533, 738 P.2d 1140 (App. 1987), and *Koory v. Western Casualty and Surety Co.*, 153 Ariz. 412, 737 P.2d 388 (1986), *vacating* 153 Ariz. 408, 737 P.2d 384 (App.1986), are inapposite for similar reasons.

State Farm's reliance on *Security Ins. Co. of Hartford v. Andersen*, 158 Ariz.

---

**3.** We cannot agree with State Farm's attempt to distinguish *Gordinier* on the ground that it involved uninsured motorist rather than liability coverage, or that in *Gordinier* the reduction in coverage happened to result from a change in the insured couple's living arrangements. The *Gordinier* analysis did not turn on either of these factors. It proceeded instead on a straight application of the *Darner* principles to the facts revealed by the record.

426, 763 P.2d 246 (App.1988),[4] is also misplaced. That case, which was decided before *Gordinier*, concerned an aircraft liability policy of which the insured pilot had not yet even seen a copy before the insured airplane crashed, killing him and his two passengers. The insurer denied coverage on the grounds, *inter alia*, that the insured pilot did not have a current medical certificate as required by the policy boilerplate. We rejected the insured's estate's challenge under *Darner*, stating:

> Although Andersen's failure to renew his medical certificate certainly frustrated his dominant purpose in purchasing aircraft liability coverage from Security, there is no evidence that Security or its agents knew or even had reason to know that this was so. *Indeed, because Federal law requires pilots to hold valid, current medical certificates to fly their planes legally, Security could justifiably have taken it as a given that Andersen would have such a certificate before operating the insured aircraft.* Security had no reason to believe that Andersen would not have assented to the terms of the policy as a whole if he had known it contained a term requiring him to have a valid, current medical certificate when piloting the insured aircraft. The *Darner* rule thus does not preclude enforcement of that term.
>
> . . . .
>
> Contrary to the thrust of appellants' argument, *Darner* does not require insurers to read their insureds' minds. (Emphasis added.)

*Security Insurance Company of Hartford v. Andersen*, 158 Ariz. 431, 438, 763 P.2d 251, 258 (App.1986). In contrast, application of the exclusion in question here does not turn on any unusual extrinsic fact about the insured that the insurer could not reasonably have been expected to know. Instead, as we have held, the exclusion in this case is unenforceable against the Dimmers because of its technical wording and inconspicuous location within the policy boilerplate, and because it guts the coverage ostensibly granted by the declarations page.

Reversed and remanded with directions to enter judgment for appellants.

GRANT, C.J., concurs.

BROOKS, Judge, dissenting,

I respectfully disagree with the majority's conclusions as to what a reasonably intelligent insured would believe when presented with the insurance policy at issue in this case. At the very least, a factual issue is presented which precludes summary judgment in favor of the insured.

The majority concedes that the family or household exclusion clause at issue does not violate public policy, and that it is neither unusual nor unconscionable. The majority concludes, however, that the exclusion is unenforceable "because of its technical wording and inconspicuous location within the policy boilerplate, and because it guts the coverage ostensibly granted by the declarations page."

First, by their very nature, *all* policy exclusions have an eviscerating effect on the face amount of coverage. Were it otherwise, they would not be "exclusions." Considering the policy in the instant case as a whole, however, I find it to be clear and unambiguous as to the extent of coverage.

Further, contrary to the majority's conclusion, there is nothing "inconspicuous" about the location of the policy provision in question. To the contrary, it is quite prominently displayed in the liability section of the policy that begins by advising the reader that "THERE IS NO COVERAGE. . . ."

**4.** The Arizona Supreme Court accepted review in this case on an entirely different issue than the one discussed herein. In its opinion in *Security Insurance Company of Hartford v. Andersen*, the court stated: "We vacate such parts of the court of appeals' opinion as are inconsistent with this opinion and reinstate the trial court's judgment on that issue."

The portion of the court of appeals' opinion discussed herein is not inconsistent with the supreme court's opinion.

(Emphasis in original.) This section immediately follows the description of what *is* covered—certainly not an unreasonable sequence.

The majority does not tell us where the exclusion at issue should have been placed, except by inferring that the declarations page would have been an appropriate location. Carrying the majority's analysis to its natural conclusion, however, it could be argued that all limits of liability are unenforceable if they deviate from the summary of coverage on the declarations page—a patently unreasonable position. Moreover, at least in the case at hand, such an argument would ignore the following notation which prominently appears on the declarations page:

> YOUR POLICY CONSISTS OF THIS PAGE, ANY ENDORSEMENTS, AND THE POLICY BOOKLET, FORM 9803.4. PLEASE KEEP TOGETHER.

(Emphasis in original.) Further, the declarations page also lists the general types of coverage, e.g., "liability," and then notes that they are "AS DEFINED IN POLICY." (Emphasis in original.)

In conclusion, I would affirm the judgment of the trial court. At the very minimum, however, the matter should be remanded for a trial on the merits rather than directing entry of summary judgment in favor of the insured. Otherwise, it appears that the majority has taken a rather bold step by concluding that issues of "reasonable expectations" in contracts of insurance are questions of law to be resolved in all instances by the court.